**In re PALACE QUALITY SERVICES INDUSTRIES, INC., Debtor.**

No. 98–57698.

United States Bankruptcy Court, E.D. Michigan.

Oct. 9, 2002.

Daniel M. Katlein, Detroit, MI, for Debtor.

Alicia S. Wellford, Detroit, MI, for RDK&Z Lease Company.

Mark S. Shapiro, Southfield, MI, for Chapter 7 Trustee.

## OPINION RE: RDK & Z LEASE COMPANY'S MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

JEFFREY R. HUGHES, Bankruptcy Judge.

Debtor leased equipment from RDK & Z Lease Company ("RDK & Z") for use in its business. The issue before me is whether RDK & Z may recover from the estate the actual post-petition rents and late fees due under the lease agreement which arose prior to its rejection by the Chapter 7 trustee. The Chapter 7 trustee contends that RDK & Z is not entitled to any recovery subsequent to the cessation of Debtor's operations during the Chapter 11 proceeding.

For the reasons stated in this opinion, I conclude that RDK & Z is entitled to an administrative claim for these unpaid post-petition rents and late fees. I do not agree with RDK & Z's contention that it is entitled to this claim because of Section 365(d)(10) of the Bankruptcy Code.[1] Rather, I conclude that RDK & Z is entitled to this claim simply because these unpaid rents and late fees constitute expenses en-

---

1. Hereinafter, textual citations to "Section _____" shall mean the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

titled to administrative priority under Section 503(b)(1).

## I. FACTUAL BACKGROUND

Debtor filed for relief under Chapter 11 of the Bankruptcy Code on October 9, 1998. Debtor operated its business in the Chapter 11 proceeding until sometime in June 2000. However, Debtor did not immediately convert to a Chapter 7 proceeding once it ceased operations. Rather, Debtor remained in the Chapter 11 proceeding as a non-operating entity for approximately five months. It finally converted on November 1, 2000.

Debtor had leased from RDK & Z two washing machines for use in its commercial laundry business. The machines, known as "tunnel washers," were so large that one party described them as two missile silos set on their sides. Debtor neither assumed nor rejected the RDK & Z lease agreement during the Chapter 11 proceeding although Debtor did continue using the two tunnel washers until it ceased operations. The tunnel washers remained at Debtor's former business location.

The Chapter 7 trustee did not operate Debtor's business after the case was converted and therefore the tunnel washers remained unused during the Chapter 7 proceeding. The Chapter 7 trustee did not assume or reject the RDK & Z lease agreement and he did not seek an extension of the time within which he could assume or reject it. Therefore, the RDK & Z lease agreement was deemed rejected as a matter of law as of December 30, 2000. 11 U.S.C. §§ 348(c), 365(d)(1). Neither RDK & Z nor the Chapter 7 trustee made any effort to remove the tunnel washers from Debtor's former business premises after the rejection of the lease and they were still at that location when RDK & Z filed its motion.

Debtor's lease agreement with RDK & Z required it to pay $17,250.00 per month as rent for the two tunnel washers. Debtor, as debtor-in-possession of the Chapter 11 estate, paid this amount to RDK & Z as post-petition rent for the remaining three months of 1998, for all of 1999, and for the first three months of 2000. However, Debtor paid only $16,850.00 per month to RDK & Z for April, May, and June of 2000 and Debtor did not pay anything to RDK & Z after it ceased operations in June 2000. The Chapter 7 trustee has made no rental payments to RDK & Z on account of the tunnel washers.

RDK & Z's motion seeks the allowance of an administrative expense in the amount of $120,675.00. Of this total, RDK & Z claims that $81,000.00 represents unpaid lease payments during the balance of Debtor's Chapter 11 proceeding,[2] $3,450.00 represents contractual late fees on account of the unpaid Chapter 11 rents, $34,500.00 represents the two months of rent during the period between the November 1, 2000 conversion and the December 30, 2000 lease rejection, and $1,725.00 represents contractual late fees for these two months of unpaid rent. RDK & Z's claim against the estate does not include any amount for periods after December 2000 although Debtor remained in possession of the tunnel washers after that date. Apparently, RDK & Z concedes that whatever right it has against the estate for post-petition rental payments terminated upon the auto-

---

**2.** This amount includes both the months when Debtor underpaid the amount due RDK & Z (April–June, 2000) and the months when Debtor paid RDK & Z nothing (July–October 2000). At the hearing, RDK & Z stated that the shortfall in each of the 3 months it received only a partial lease payment was $400 (i.e., April–June, 2000). If this is true, then RDK & Z's Chapter 11 claim should be $70,200.00, not $81,000.

matic rejection of the lease agreement under Section 365(d)(1).

RDK & Z offers separate theories for the allowance of its Chapter 11 administrative expense claim and its Chapter 7 administrative expense claim. RDK & Z relies upon Section 365(d)(10) as the basis for its Chapter 11 administrative claim. It argues that that section, in and of itself, creates an administrative-type claim against the estate equal to the difference between what Debtor should have paid RDK & Z under the lease agreement between the petition date (October 9, 1998) and the conversion date (November 1, 2000) and what Debtor actually paid to RDK & Z on account of the lease during this time period.

RDK & Z relies upon a different theory with respect to its Chapter 7 administrative claim.[3] RDK & Z argues that it has an actual Section 503(b)(1)(A) administrative expense claim for the two months of lease payments owing subsequent to Debtor's conversion to a Chapter 7 proceeding. It further contends that the actual rent due under its lease agreement with Debtor

for this period represents the tunnel washers' reasonable rental value.

The Chapter 7 trustee asserts that RDK & Z is entitled to a Chapter 11 administrative claim in the amount of $1,200, that amount being the unpaid balance of the rents owing for April, May, and June 2000, and to no Chapter 7 administrative expenses at all. He contends that RDK & Z should have removed the tunnel washers and re-let them once Debtor ceased operations. He suggests that RDK & Z's reason for not repossessing the tunnel washers was that RDK & Z's own interests were better served by leaving the tunnel washers in place and re-letting them to whomever might purchase the remaining equipment and the building in which they are housed.[4]

RDK & Z served its motion upon the Chapter 7 trustee and the mailing matrix and notified all recipients of their right to file written objections to the motion. The Chapter 7 trustee and two administrative claimants filed timely objections. Pursuant to this court's local rules, a hearing was held to consider these objections. Only

---

3. If Section 365(d)(10) creates an administrative-like claim for commercial equipment leases separate and apart from Section 503(b)(1)(A), that claim arises only for lease obligations which first arose on or after 60 days from the order for relief. In the instant case, the 60–day period had passed in the Chapter 11 proceeding well before Debtor's lapse in making the agreed upon lease payments. However, Section 348(c) provides that the date of conversion is to be treated as if it were the order for relief for purposes of Section 365(d) when the case has been converted from a Chapter 11 proceeding to a Chapter 7 proceeding. Therefore, RDK & Z cannot rely upon Section 365(d)(10) as the basis for its Chapter 7 administrative claim because its Chapter 7 administrative claim is for only this second 60–day period following Debtor's conversion.

4. RDK & Z's rebuttal to the Chapter 7 trustee's contention is that Debtor requested it to

leave the tunnel washers on site so that the estate could sell all of the business assets together as a "turnkey" operation. RDK & Z asserts that this request was made sometime after Debtor terminated operations but before the case was converted. However, there is a question whether Debtor itself actually made this request since an entity controlled by the wife of the Debtor's principal shareholder owns the building in which the two tunnel washers are located. The Chapter 7 trustee argues, with at least some justification, that any request by Debtor's principal shareholder to have Debtor remain in possession of this equipment was not on behalf of Debtor, but on behalf of the principal shareholder's wife.

However, for the reasons stated in this opinion, RDK & Z's motivation for not repossessing the tunnel washers is irrelevant. RDK & Z was entitled to recover as an administrative claim the actual unpaid rents due under the lease until the lease was rejected.

RDK & Z and the Chapter 7 trustee appeared at the hearing. Neither party offered any proofs because there was no material fact at issue.[5]

## II. DISCUSSION

### A. RDK & Z's Section 365(d)(10) Chapter 11 "Administrative Claim."

█ Both Trustee and RDK & Z have focused on whether Section 365(d)(10) automatically grants RDK & Z an administrative priority claim for unpaid rents for the time period between when Debtor ceased operations (June 2000) and the conversion of Debtor's case from a Chapter 11 proceeding to a Chapter 7 proceeding (November 2000). RDK & Z contends that it is irrelevant whether Debtor ceased operations or not because Section 365(d)(10) required Debtor to continue making lease payments during that time period in any event.

> (10) The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f). Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

11 U.S.C. § 365(d)(10).

Trustee's argument against the allowance of RDK & Z's claim for unpaid lease payments during this time period is based upon the interplay of Section 365(d)(10) and Section 348(d) of the Bankruptcy Code. Trustee acknowledges the case law which holds that the failure to comply with the performance obligations mandated by Section 365(d)(10) creates the equivalent of a priority claim. See, e.g., In re Kyle Trucking, Inc., 239 B.R. 198 (Bankr. N.D.Ind.1999); Omni Partners, L.P. v. Pudgie's Dev. of NY, Inc. (In re Pudgie's Development of NY, Inc.), 239 B.R. 688 (S.D.N.Y.1999). However, Trustee contends that a lessor's claim for this unfulfilled obligation loses its priority status upon conversion of the Chapter 11 proceeding to a Chapter 7 proceeding because of Section 348(d).

> (d) A claim against the estate or the debtor that arises after the order for relief but before conversion in a case that is converted under section 1112, 1208, or 1307 of this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition.

11 U.S.C. § 348(d).

Trustee's argument is that while a lessor's claim for unpaid Chapter 11 lease payments may be the equivalent of a Sec-

---

**5.** The objecting parties who did not appear at the hearing were EMC Gas Transmission and HHMcK, LLC. EMC objected only to the payment of RDK & Z's Chapter 11 administrative claim and then only to the extent the payment might be inconsistent with a pro rata distribution to all Chapter 11 administrative claimants. HHMcK objected to both the allowance and payment of RDK & Z's administrative claims. I have considered both written objections in making my decision.

tion 503(b)(1) claim, it is not in fact a Section 503(b)(1) claim and Section 348(d) is quite clear that all post-petition claims incurred in a Chapter 11 proceeding other than those entitled to priority under Section 503(b) are to be treated as if they arose pre-petition if the Chapter 11 proceeding is subsequently converted to a Chapter 7 proceeding.

*In re Eastern Agri–Systems, Inc.*, 258 B.R. 352 (Bankr.E.D.N.C.2000) appears to be the only reported case which has addressed this issue. *Eastern Agri–Systems* involved very similar facts. The debtor held a leasehold interest in some farm equipment under a lease agreement which had not expired when the debtor filed its Chapter 11 petition. The debtor remained in a Chapter 11 for approximately three months. The case was then converted to a Chapter 7 proceeding. The debtor retained the leased equipment throughout the Chapter 11 proceeding. However, the parties agreed that the debtor did not operate at any time during the Chapter 11 proceeding and that debtor otherwise did not use the leased equipment during that time period. Nonetheless, the lessor claimed that it was entitled to an administrative expense in the amount of $1,220.19 for unpaid lease payments during the Chapter 11 pursuant to Section 365(d)(10). The Chapter 7 trustee objected on the basis that Section 348(d) barred the lessor's administrative claim.

The court in *Eastern Agri–Systems* began its analysis by adopting the position taken by most courts which have analyzed Section 365(d)(10) or the related Section 365(d)(3)[6], that being that the failure of the trustee/debtor-in-possession to pay rent and other monetary obligations mandated by these sections creates an administrative priority claim which is independent of any administrative priority claim authorized by Section 503(b)(1). *Id.* at 354. Consequently, the court determined that the lessor in *Eastern Agri–Systems* would have been entitled to a Chapter 11 administrative-type claim had the debtor not converted to a Chapter 7 proceeding. However, the court also acknowledged that Section 348(d), if read literally, would bar the lessor from making the same Chapter 11 administrative-type claim in a converted Chapter 7 proceeding. The Court resolved this conflict by ignoring Section 348(d). It theorized that Congress simply overlooked Section 348(d) when it was making the necessary adjustments to the Bankruptcy Code to accommodate the additions of both Section 365(d)(3) and Section 365(d)(10).[7]

I am not satisfied with the solution adopted by the court in *Eastern Agri–*

---

**6.** Section 365(d)(3) dictates the trustee's obligations to perform under a commercial lease of real property prior to the trustee's decision to assume or reject the lease.

> (d)(3) The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for perfor-

mance shall not be extended beyond such 60–day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

> 11 U.S.C. § 365(d)(3).

**7.** Section 365(d)(3) was added to the Bankruptcy Code in 1984 as part of the Bankruptcy Amendments and Federal Judgeship Act, Pub.L. 98–353, and Section 365(d)(10) was added in 1994 as part of the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394.

*Systems* to reconcile these two sections of the Bankruptcy Code. It is certainly possible that Congress made a mistake and overlooked a necessary modification to Section 348(d) when it added Section 365(d)(3) to the Bankruptcy Code in 1984 to accommodate commercial landlords and that Congress made the same mistake yet again when it added Section 365(d)(10) to the Bankruptcy Code in 1994 to accommodate commercial equipment lessors. However, it is appropriate to reach such a conclusion only after the court has made the utmost effort to otherwise reconcile the conflicting sections.

The court in *Eastern Agri–Systems* based its conclusion that Section 365(d)(10) and Section 348(d) were irreconcilable upon the premise that Section 365(d)(10) creates an administrative-like claim for unpaid lease payments which is entitled to the same priority as claims which clearly fall within the ambit of Section 503(b)(1)(A). I concede that most courts have interpreted Section 365(d)(10) and Section 365(d)(3) to include the creation of an administrative-like claim for unpaid lease payments. *See, e.g., In re Kyle Trucking, Inc.,* 239 B.R. 198 (Bankr. N.D.Ind.1999) (claim under Section 365(d)(10)); *In re Compuadd Corp.,* 166 B.R. 862 (Bankr.W.D.Tex.1994) (claim under Section 365(d)(3)); *Towers v. Chickering & Gregory (In re Pacific–Atlantic Trading Co.),* 27 F.3d 401 (9th Cir.1994) (claim under Section 365(d)(3)); *In re Wingspread Corp.,* 116 B.R. 915 (Bankr. S.D.N.Y.1990) (claim under Section 365(d)(3)); *Cukierman v. Uecker (In re Cukierman),* 265 F.3d 846 (9th Cir.2001) (claim under Section 365(d)(3)); *In re Kirsch,* 242 B.R. 77 (Bankr.M.D.Fla.1999) (claim under Section 365(d)(3)). However, a few courts have disagreed with this interpretation of Section 365(d)(3) and Section 365(d)(10). *See, e.g., In re Mr. Gatti's, Inc.,* 164 B.R. 929 (Bankr.W.D.Tex.

1994); *Great Western Savings Bank v. Orvco (In re Orvco),* 95 B.R. 724 (9th Cir. BAP 1989); *In re Laurence R. Smith, Inc.,* 127 B.R. 715 (Bankr.D.Conn.1991). These courts have concluded that Section 365(d)(3) and Section 365(d)(10) are not intended to be remedial. They interpret these sections as simply declarations of the trustee's obligations with respect to an unexpired lease of commercial property prior to the trustee's decision to assume or reject the lease. If a trustee fails to fulfill the obligations proscribed by these sections, the remedy lies elsewhere in the Bankruptcy Code (*e.g.,* modification of the automatic stay pursuant to Section 362(d)(1)). *In re Mr. Gatti's, Inc.,* 164 B.R. at 943; *In re Orvco,* 95 B.R. at 726.

If the court in *Eastern Agri–Systems* had adopted the alternative interpretation of Sections 365(d)(3) and (d)(10) offered in *Mr. Gatti's* and *Orvco,* Section 348(d) would be reconciled with these sections. In other words, if Sections 365(d)(3) and (d)(10) were interpreted as not creating an administrative-like claim independent of Section 503(b), then the apparent conflict raised by the language contained in Section 348(d) would simply disappear. Given that adoption of this alternative interpretation would reconcile the apparent conflict among these sections, I am constrained to question whether the majority interpretation of Sections 365(d)(3) and (d)(10) is in fact the correct interpretation.

The competing interpretations of Sections 365(d)(3) and (d)(10) and the rationale supporting each of these interpretations are set forth in the excellent opinions written by Judge Kelly in *In re Mr. Gatti's, Inc.* and by Judge Monroe in *In re Compuadd.* Both *Mr. Gatti's* and *Compuadd* involved commercial real property leases and therefore each court addressed the issue of post-petition lease payments in the context of Section 365(d)(3). Judge

Kelly described in detail in *Mr. Gatti's* the two competing interpretations of Section 365(d)(3). He outlined the four rationales adopted by the various courts which have concluded that Section 365(d)(3) creates an independent administrative-like claim for unpaid post-petition lease payments incurred before rejection of the unexpired lease.

> 1. The language of Section 365(d)(3) expresses a clear and unambiguous intent that the debtor-lessee should pay, pending a decision on whether to assume or reject the lease;
>
> 2. To rule that the landlord's claim is not automatically entitled to an administrative priority would somehow give the debtor an incentive during the first sixty days of the case not to perform;
>
> 3. Section 365(d)(3) is a specific statute which controls over the general remedy provisions of Section 503(b); and/or
>
> 4. That landlord's claim is unique and constitutes a unique category under the Bankruptcy Code, with better treatment than an administrative claim.

*In re Mr. Gatti's,* 164 B.R. at 942-43.

Judge Kelly then explained why each of these rationales was unpersuasive and why the rationale posited by the Bankruptcy Appellate Panel in *Orvco* was correct. *Id.* at 943-46.

Judge Monroe wrote *Compuadd* within weeks of *Mr. Gatti's* to defend the majority's interpretation of Section 365(d)(3). Judge Monroe's rebuttal is as simple as it is forceful: Congress left no room within Section 365(d)(3) (and by implication, Section 365(d)(10)) for the interpretation championed by Judge Kelly on behalf of the minority.

> The first task is to look at the plain meaning of the above-cited language of § 365(d)(3). Upon first reading it is clear. The trustee is mandated to time-ly comply with all obligations of the debtor with regard to any unexpired lease of non-residential real property until it is assumed or rejected regardless of what § 503 may require other claimants to do to establish an administrative claim. *I fail to see any ambiguity in that language.* And, I decline to follow the minority line of cases with which my companion joined and which in my opinion go beyond the clear language of the statute to reach their result.

*In re Compuadd,* 166 B.R. at 864 (emphasis in original).

I disagree with Judge Monroe's conclusion that Section 365(d)(3) is a clear and unambiguous statement of Congressional intent. The definition of "ambiguous" is "capable of being understood in two or more possible senses or ways." Websters Ninth New Collegiate Dictionary (1989). I do not dispute that the majority's interpretation of these sections is reasonable. However, the majority must likewise concede that the interpretation urged by the minority is also reasonable. I myself am certainly comfortable interpreting the phrase "notwithstanding Section 503(b)(1) of this title" as it appears in Sections 363(d)(3) and (d)(10) as not including a remedial component. Prior to the enactment of these sections, it was common to placate a lessor who was not receiving post-petition rents while the trustee was deciding to assume or reject with the palliative that the lessor could always file an administrative claim for the unpaid rents. Therefore, the reference to Section 503(b)(1) in these two sections can be interpreted as nothing more than an affirmative statement by Congress that the availability of a Section 503(b)(1) administrative claim may no longer be used to excuse trustees from paying post-petition rents on unexpired leases of commercial property as they become due. In other words, the reference to Section 503(b)(1) in these two

sections means only that a trustee holding a leasehold interest in commercial real estate or equipment cannot defer a lessor's request for relief from stay to commence repossession proceedings by offering the lessor an administrative claim for any post-petition rents which cannot be paid. Sections 365(d)(3) and (d)(10) mandate that the trustee remain current on the lease payments if the trustee wishes to take additional time to decide whether to assume or reject the lease.[8]

Courts which have espoused the majority interpretation of Sections 365(d)(3) and (d)(10) have relied upon the legislative history supporting the 1984 amendment which added Section 365(d)(3). *See, e.g.,* *In re Wingspread Corp.,* 116 B.R. at 926. That these courts have had to rely upon the legislative history to support their interpretation of Sections 365(d)(3) and (d)(10) is itself proof that these sections are susceptible to different interpretations. Moreover, the legislative history does not provide any more support for the majority interpretation than the actual code sections themselves.

Congress's clear purpose in enacting these two sections was to compel the trustee to pay the ongoing obligations of the debtor under the lease while the trustee evaluated the option of either assuming or rejecting the lease.

**A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease.** These payments include rent due the landlord and common area charges which are paid by all the tenants according to the amount of the space they lease. **In this situation, the landlord is forced to provide current services-the use of its property, utilities, security, and other services-without current payment.** No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor. **This bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of non-residential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.**

8. I further observe that Section 365(*o*) also imposes upon the trustee a duty to timely perform post-petition obligations which arise under a pre-petition commitment which the estate has inherited from the debtor.

(*o*) In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

11 U.S.C. § 365(*o*).

It is absolutely clear that the regulatory agency's claim under Section 365(*o*) for any post-petition breach of a capital commitment by a debtor to an insured depository institution is to be treated as a Section 507 priority claim. The absence of similar language in Sections 365(d)(3) and 365(d)(10) suggests that Congress did not intend either of these two sections to create an independent priority claim for any post-petition breach of the obligations imposed upon the trustee by these two sections.

130 Cong. Rec. S8887, S8894–95 (daily ed. June 29, 1984) (remarks of Sen. Hatch) (emphasis added). However, Senator Hatch did not include within his remarks any statement to the effect that lessors who did not receive the required post-petition lease payments would be entitled to an administrative-like claim against the estate. Rather, Senator Hatch stated only that trustees must pay the current rent as it comes due while the trustee decides whether to assume or reject the unexpired lease. Indeed, the inequity which Senator Hatch was addressing was not the inability of the aggrieved landlord to recover unpaid rents as an administrative expense at some later date, but rather the unfairness of a landlord being denied not only the right to repossess the subject property but also the payment of current rents while the trustee decides whether the lease may be worth assuming or not. It is clear at least to me that Congress, when it enacted Section 365(d)(3) and Section 365(d)(10), did not choose the imposition of an administrative claim for actual rents due as the remedy for a trustee's failure to pay a commercial landlord post-petition rents when due. The remedy which Congress chose was nothing short of the estate losing the right to assume the unexpired lease and the attendant right of the landlord to seek relief from the automatic stay to recover possession of the subject property.[9]

However, the legislative history underlying Section 365(d)(3) and (d)(10) ultimately has very little bearing on my decision to adopt the minority interpretation of these sections. It is sufficient for me that the legislative history, like the sections themselves, can be reasonably read to support the minority position. What is determinative for me is that the majority decision results in a conflict between Section 348(d) and Sections 365(d)(3) and (d)(10) whereas the minority position reconciles these sections. Therefore, for the reasons I have given, I decline to follow *Eastern Agri-Systems*. Instead, I conclude that RDK & Z is not entitled to any administrative-like claim under Section 365(d)(10). If RDK & Z is to have any priority claim for the post-petition lease payments which Debtor did not make prior to the conversion, that claim must qualify as an administrative expense pursuant to Section 503(b)(1)(A).

## B. *RDK & Z's Section 503(b)(1)(A) Administrative Claim.*

RDK & Z's Chapter 7 administrative claim for the two months of rent due between Debtor's conversion to a Chapter 7 proceeding and the rejection of the unexpired lease is not based upon Section 365(d)(1). RDK & Z instead relies upon Section 503(b)(1)(A) to support this claim.

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> > (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.]

11 U.S.C. § 503(b)(1)(A).

RDK & Z also offers Section 503(b)(1)(A) as an alternative basis for the

---

9. An interesting question presented by the 1984 amendment to the Bankruptcy Code concerning commercial real estate leases is whether a rejection precipitated by the trustee's failure to make the payments required by Section 365(d)(3) also precipitates the immediate surrender of the subject property pursuant to Section 365(d)(4). While logic suggests that immediate surrender of the subject property should follow from a Section 365(d)(3) default, Section 365(d)(4) *does not specifically* provide for such a result. However, this is an issue which is beyond the scope of what is before me and, therefore, must be left for another day.

allowance of its Chapter 11 administrative claim.

RDK & Z asserts that it should be allowed Chapter 11 and Chapter 7 administrative claims for unpaid rents equal to the amount actually due under the lease agreement because both Debtor and the Chapter 7 trustee benefitted from the estate's retention of the two tunnel washers even after Debtor ceased operations. The benefit, RDK & Z argues, was the enhancement in value of the remaining assets of the estate which could be realized if these assets could be sold together as a "turnkey" operation [10] instead of separately at auction. RDK & Z concedes that the case law limits its recovery from the estate to the reasonable rental value of the tunnel washers. However, it argues that the actual payments due under the lease represent a fair rent for the washers.

I agree that RDK & Z is entitled to both Chapter 7 and Chapter 11 administrative claims under Section 503(b)(1)(A) in the amounts it has requested. However, my reasons for reaching this conclusion are very different from the arguments offered by RDK & Z.

### 1. The Bankruptcy Code and Unexpired Leases Generally.

I have been impressed time and time again by how well the various sections of the Bankruptcy Code fit together to comprehensively address the competing interests which arise when debtors become insolvent or otherwise cannot afford to pay their creditors. The Bankruptcy Code is a "coherent" and "consistent" statutory scheme. *United States v. Ron Pear Enterprises, Inc.,* 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1029–30, 103 L.Ed.2d 290 (1989). I attribute this accomplishment in part to the careful attention given by many thoughtful people to its many provisions.[11] As I have studied and reflected upon the issue before me, it became more and more apparent that a solution could not be reached without first understanding how executory contracts and unexpired leases fit within this comprehensive statutory scheme. Therefore, I begin my analysis with this essential task.

A lease is an agreement which divides between two parties the rights related to certain property.

**Lease.** Any agreement which gives rise to relationship of landlord and tenant (real property) or lessor and lessee (real or personal property). A contract for exclusive possession of lands, tenements or hereditaments for life, for term of years, at will, or for any interest less than that of lessor, usually for a specified rent or compensation. Contract wherein one lets to the other a certain space, property or building for specified unit of time, generally a week, month or year. Agreement under which owner gives up possession and use of his property for valuable consideration and for definite term and at end of term owner has absolute right to retake, control and use property.

Black's Law Dictionary 889 (6th ed.1991) (citations omitted).

A key characteristic of this relationship is that the lessee's rights in the property **derive** from those of the lessor. The lessor always retains ownership of the prop-

---

**10.** A turnkey operation is a manufacturing plant or line which is ready to operate but which is not actually operating.

**11.** However, I give equal if not greater credit to the fortuitous fact that the Bankruptcy Code largely escaped the notice of special interest groups as it wound its way through the legislative process prior to its enactment in 1980.

erty which is subject to the lease, whether the property is real estate, an automobile, or something else. Whatever right the lessee has to use that property is dictated by the terms of the agreement reached with the lessor. A lessee may continue to use the subject property to the exclusion of the lessor only for so long as the lessee pays the agreed rent and otherwise complies with the terms of the lease. If the lessee defaults, then the lessor has the right to regain possession of the subject property. The lessor can regain possession either through the lessee's voluntary abandonment of the leasehold interest or through legal process. Either way, the recovery of possession results in the resurrection of the lessor's undivided interest in the subject property which had existed prior to its grant of the leasehold interest to the lessee.

■ It is well settled that a debtor's interest as a lessee in an unexpired lease (*i.e.*, a leasehold interest) is property of the estate. *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687, 702 (Bankr. S.D.N.Y.1992); *In re Alert Holdings, Inc.*, 148 B.R. 194, 203 (Bankr.S.D.N.Y.1992). *See also,* Collier on Bankruptcy App.P. 4–1505 (Lawrence P. King 15th ed. rev.1997). However, what many courts appear to miss in their acknowledgment that a debtor's leasehold interest is property of the estate is that Section 541(a)(1) only creates for the bankruptcy estate that which the debtor herself had as of the petition date:

### § 541. Property of the estate.

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all of the following property, wherever located and by whomever held:

(1) Except as provided in subsection (b) and (c)(2) of this section, **all legal or equitable interests of the debtor in property** as of the commencement of the case.

11 U.S.C. § 541(a)(1) (emphasis added).

In other words, Section 541(a)(1) is simply a mechanism to transfer to the bankruptcy estate whatever interests the debtor has in property as of the date of her petition so that these interests may be administered by the trustee. *See, Talbert v. City Mortgage Services (In re Talbert)*, 268 B.R. 811 (Bankr.W.D.Mich.2001).

The effect of the Section 541(a)(1) transfer is neutral. The newly created estate receives no more or no less under Section 541(a)(1) than what the debtor had to transfer.

Though this paragraph will include choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case. For example, if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to pursue that claim, because he too would be barred. He could take no greater rights than the debtor himself had.

Collier on Bankruptcy App.P. 4–1505–06 (Lawrence P. King 15th ed. rev.1997).

A leasehold interest which is acquired by the bankruptcy estate from the debtor is no less subject to this "neutral transfer" principle than any other property interest held by the debtor. If the debtor is obligated to pay an agreed rental fee as a condition to possessing property which is owned by the lessor, then the bankruptcy estate must also be subject to that same obligation as a condition to the estate's continued possession of that property. Otherwise, the bankruptcy estate would have rights in the leased property greater than those which the debtor had to transfer pursuant to Section 541(a)(1). Put sim-

ply, Section 541(a)(1) offers the trustee no independent right to remain in possession of leased property acquired from the debtor. Whatever right the trustee has under Section 541(a)(1) must derive from the debtor. Therefore, the estate must be bound by the same lease terms as those which bound the debtor pre-petition.

The validity of this "neutral transfer" principle is even more apparent when the Section 541(a)(1) transfer of an executory contract is considered.[12] For example, assume that A promises to deliver to B an automobile on August 10th and B promises to pay A $20,000 upon delivery. If B filed for Chapter 7 bankruptcy relief on August 8th, Section 541(a)(1) would transfer to the bankruptcy estate all of B's interests in property, including his rights in what is clearly an executory contract with A. However, the trustee would have no more right under Section 541(a)(1) to compel A to deliver the automobile without also tendering the $20,000 due upon delivery than B itself would have had had he elected not to file a bankruptcy petition and had B demanded delivery without tender of payment. If the trustee's interest in the automobile contract is limited by B's duties under that contract, then the trustee's interest in a leasehold interest must be similarly limited by the debtor's duties under the terms of the lease agreement.

I am also unable to find any other provision within the Bankruptcy Code which permits the trustee to temporarily rewrite the terms of an unexpired lease acquired from the debtor so as to reduce or eliminate the estate's obligation to make the lease payments as a condition to remaining in possession of the leased property. Section 363 is the logical place to look for such authority, since that section dictates the circumstances under which a trustee may use property of the estate. Indeed, subsections (b) and (c) of that section permit a trustee to use property of the estate (other than cash collateral) subject only to the condition that the trustee provide adequate protection to an interest holder in that property who requests such adequate protection. 11 U.S.C. § 363(e). It is tempting to interpret these subsections as creating a post-petition environment where the trustee may use property in which the debtor possesses a leasehold interest in the same manner as any other property which the debtor might own at the inception of the bankruptcy proceeding. The trustee would have the right to use the leased property without paying any rent as long as the lessor does not object and the trustee would continue to have the right to use the leased property even if the lessor objected provided that the lessor received adequate protection. Moreover, the adequate protection which the trustee would have to provide would be the fair rental value based upon the trustee's actual use, not the rental amount which the debtor

---

12. An executory contract is different from an unexpired lease. An executory contract evidences a relationship between two parties in which both parties are contractually obligated to deliver goods or services for the benefit of the other. An executory contract has two key characteristics:

 a. Each party has obligations under the contract which remain unperformed at the time of the debtor's bankruptcy petition; and

 b. The nature of each party's unperformed obligations under the contract are of suf-

ficient importance such that the party's failure to perform those remaining obligations would constitute a material breach of the contract, thereby excusing the other party from performing its remaining duties.

*Terrell v. Albaugh (In re Terrell),* 892 F.2d 469, 471 (6th Cir.1989).

A lease differs from an executory contract because the primary obligation of the lessor, that being the delivery of possession of the property to the lessee, is performed at the commencement of the lease.

had agreed upon at the inception of the lease.

The problem with this interpretation is that the trustee's authority under Section 363(b) and (c) extends only to "property of the estate." In other words, the trustee's authority may not extend beyond the debtor's own interest in the property. 11 U.S.C. § 541(a)(1). In many instances, the interest which the bankruptcy estate acquires from the debtor by operation of Section 541(a)(1) is an undivided ownership interest subject perhaps to liens held by one or more secured creditors. However, as already discussed, a debtor's right to use property which it possesses because of a leasehold interest is by its very nature limited to the terms of the agreement which created that leasehold interest. If the debtor's property which trustee proposed to use was stolen property, there is no question that the trustee's right to use that property under Section 363(b) or (c) would be no greater than that of the debtor/thief. Similarly, if the debtor's property which trustee proposed to use was a leasehold interest which had already expired, the trustee's right to continue using the property subject to the leasehold interest would be no greater than that of the debtor as the original lessee. Therefore, it is only logical that the trustee's right under Section 363(b) or (c) to use property which the debtor possessed under the terms of an unexpired lease is no greater than the debtor's right under the terms of the lease agreement which debtor had reached with the owner of that property.[13]

**13.** The last sentence of Section 363(e) suggests that a trustee does have authority to pay the lessor adequate protection in lieu of actual lease payments for the post-petition use of the property which is subject to the lease.

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, *sold, or leased, or proposed to be* used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. **This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).**

11 U.S.C. § 363(e) (emphasis added). However, the second sentence of Section 363(e) was not in the Bankruptcy Code as originally enacted in 1980. Rather, it was included in 1994 in response to the reported case of *In re Sweetwater*, 40 B.R. 733 (Bankr. D.Utah 1984) (*see*, Bankruptcy Reform Act of 1994, Floor Statements, 140 Cong. Rec. 10,-764 (daily ed. October 4, 1994)) reprinted in E. Collier on Bankruptcy App.Pt. 9–90 at § 219 (Lawrence P. King 15th ed. rev.1996). In *Sweetwater*, the bankruptcy court concluded that a lessor to an unexpired lease was not entitled to adequate protection for the estate's use of property subject to a lease pending the estate's assumption or rejection of the lease. The property which was subject to the lease consisted of snowmobiles, computers, and other property which depreciated rapidly. The lessor had filed a motion which, among other things, had demanded adequate protection. Apparently, the parties had stipulated that if the lessor was entitled to adequate protection, the adequate protection which would have to be provided would be either an agreed upon rate of depreciation or an agreed upon fair rental value of the leased property.

Lessors of personal property were understandably displeased with *Sweetwater* and its progeny. Consequently, they called upon Congress to correct *Sweetwater*. Congress responded by amending Section 363(e) "to clarify that the lessor's interest [in personal property] is subject to adequate protection." *Id.*

If my analysis is correct, then the conclusion in *Sweetwater* that the lessor was not entitled to adequate protection under Section 363(e) was also correct. However, the result in *Sweetwater* was wrong. The reason why a lessor is not entitled to adequate protection is not because Congress intended to deprive lessors of any relief during the post-petition period a trustee is required to determine whether to assume or reject its lease. It is because there is no need under the Bankruptcy Code

Section 365 is also devoid of any provision which authorizes the trustee to temporarily rewrite the terms of a leasehold interest inherited by the trustee from the debtor pursuant to Section 541(a)(1). Courts frequently look to Section 365 as the only provision within the Bankruptcy Code which is relevant to executory contracts. However, Section 365 in fact addresses only one aspect of executory contracts and unexpired leases, their post-petition assumption or rejection.

Section 365 is nothing more than a set of rules concerning various issues which arise in connection with the trustee's decision to permanently retain (*i.e.*, assume) the debtor's rights under an executory contract or unexpired lease or to abandon (*i.e.*, reject) those rights because they are too burdensome or are of inconsequential value. Under the former Bankruptcy Act, assumption of an executory contract or unexpired lease was necessary for the contract or lease to become property of the estate.[14] However, under the Bankruptcy Code, executory contracts and unexpired leases automatically become part of the bankruptcy estate at the inception of the bankruptcy proceeding. 11 U.S.C. § 541(a)(1). The trustee has the authority under Section 363(b) or (c) to use the property subject to

the leasehold interest acquired from the debtor, subject, of course, to the corresponding obligation of the trustee to honor the terms of that lease or contract. The trustee also has the ability to remove the executory contract or unexpired lease from the estate's assets by exercising her abandonment power. 11 U.S.C. § 554(a). As for the lessor of an unexpired lease, it looks to Section 362(d)(1) for relief from the automatic stay to repossess the subject property from the estate.

Section 365 supplements these other sections of the Bankruptcy Code with 15 separate subsections. However, none of these subsections permit the trustee to ignore the terms of an executory contract or unexpired lease during the post-petition interval when she is deciding whether to assume or reject it. Subsection (a) empowers the trustee to assume or reject executory contracts and unexpired leases subject to court approval. Subsection (b) empowers the trustee to compel performance by the other party to the contract or lease notwithstanding debtor's or the trustee's default provided certain conditions are met. Subsection (c) sets forth the types of executory contracts and unexpired leases which the trustee cannot as-

---

to provide lessors with adequate protection. As already discussed, the trustee must comply with the terms of the lease, including payment of rent, if the trustee desires to preserve the estate's leasehold interest in the property subject to the lease. A trustee cannot compel a lessor under Section 363 to accept less than the benefit of its bargain concerning a debtor's (now trustee's) continued possession of the leased property. Conversely, a lessor cannot compel the trustee under Section 363 to pay more than the benefit of the bargain in the event that the lessor miscalculated in setting the lease payment at less than the rate of depreciation associated with the leased personalty.

*Sweetwater's* error was in concluding that the lessor of personal property could be constrained from exercising its rights under the

unexpired lease until the estate had a reasonable time to decide whether to assume or reject the lease and that the lessor's only remedy if the estate ultimately elected to reject the lease was an administrative claim for the fair rental value of the property of the estate. *Sweetwater, Id.* at 745. The debtor-in-possession in *Sweetwater* should have been required to pay the agreed rent to the lessor if it wished to prevent the lessor from modifying the automatic stay and repossessing the leased property.

Therefore, it was the *Sweetwater* court's misinterpretation of Sections 363(b) and (c) which precipitated the amendment of Section 363(e) in 1994. In effect, Congress provided a cure for which no remedy was required.

14. *See* discussion *infra*, pp. 890–92.

sume. Subsection (d) balances the trustee's interest in having sufficient time to decide whether to assume or reject the contract or lease with the competing interests of the non-debtor party to an executory contract and the lessor in an unexpired lease to know whether they will ultimately be bound or not to the contract or lease. Subsection (e) describes provisions in a contract or lease which may not be used to modify or terminate the contract or lease post-petition. Subsections (f), (k), and (l) set forth the circumstances under which a trustee may assign an executory contract or unexpired lease and the effect of any such assignment upon the estate. Subsection (g) establishes rules concerning the administration of claims resulting from the trustee's decision to reject an executory contract or unexpired lease. Subsections (h), (i), and (j) define the rights of a lessee of real property or a purchaser of real property (or timeshare thereof) in the event the debtor was the lessor or seller and the trustee elects to reject the lease or purchase contract. Subsection (m) defines leases of real property to include any rental agreement to use real property. Subsection (n) sets forth the rights of a non-debtor licensee to a license which was issued by the debtor and which the trustee has ultimately elected to reject. Finally, subsection (o) addresses the trustee's assumption of a debtor's commitment to maintain capital requirements for an insured depositing institution.

█ Many courts have relied implicitly, if not explicitly, upon Section 503(b)(1)(A) as providing authority to the trustee to compensate a lessor for unpaid post-petition rents at a rate other than that which was agreed upon between the lessor and the debtor. They have held that a lessor whose lease is ultimately rejected is entitled to an administrative expense equal only to the reasonable rental value of the subject property. *See, e.g., In re Bridgeport Plumbing Products, Inc.,* 178 B.R. 563, 565–66 (Bankr.M.D.Ga.1994); *Burlington Northern Railroad Co. v. Dant & Russell, Inc., (In re Dant & Russell, Inc.)* 853 F.2d 700, 707 (9th Cir.1988); *Memphis–Shelby County Airport Authority v. Braniff Airways, Inc., (In re Braniff Airways, Inc.),* 783 F.2d 1283, 1285–6 (5th Cir.1986); *In re Energy Resources Co., Inc.,* 47 B.R. 337, 338 (Bankr.D.Mass. 1985). However, Section 503(b) is a definitional provision, not an enabling provision. It simply describes what constitutes an administrative expense for purposes of other sections of the Bankruptcy Code. For example, Section 503(b), in conjunction with Section 507, provides guidance to the Chapter 7 trustee as to how the property of the estate is to be distributed pursuant to Section 726(a). *See also,* 11 U.S.C. §§ 522(k), 1114(e)(2), 1129(a)(9)(A), 1171(a), 1205(b)(4), 1222(a)(2), and 1322(a)(2).

To summarize, Section 541(a)(1) simply transfers to the estate that which the debtor owned as of the commencement of the debtor's bankruptcy case. While Section 541(a)(1) preserves for the benefit of the estate and its creditors whatever interests the debtor might have had, it also limits the trustee's enjoyment of these interests to the same constraints imposed upon the debtor, including the obligation to pay an agreed upon rent. Otherwise, the trustee would have a greater right in the leasehold interest than that which the debtor had to give. Moreover, there is no other provision within the Bankruptcy Code which empowers the trustee to rewrite the terms of the leasehold interest which the estate has acquired while the trustee decides to assume or reject the lease. It is the recognition of these fundamental bankruptcy concepts which dictates the analysis which now follows.

## 2. The Bankruptcy Estate's Obligation to Pay the Lessor Actual Rent Until the Unexpired Lease is Rejected.

In concept, the lessor's claim for post-petition rent against the bankruptcy estate should be no different than the lessor's claim against any other tenant.[15] Again, Section 541(a)(1) does nothing more than transfer to the bankruptcy estate the leasehold interest which the debtor had held from the lessor. The bankruptcy estate's rights in that leasehold interest are no greater and no less than those which the debtor held unless the Bankruptcy Code specifically alters those rights. Moreover, the rights acquired are to be determined by reference to state law. *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Poss v. Morris (In re Morris)*, 260 F.3d 654 (6th Cir.2001) (state law determines interest of parties in real estate) (citing *Butner*).

 Under Michigan law (which, for the most part, follows general landlord tenant law), a tenant is liable for the actual rent owing under the lease until the tenant has abandoned the leasehold. Prior to abandonment, the landlord has no duty to mitigate. *Cameron*, Michigan Real Property Law, Principles and Commentary (2nd Ed.1993), ¶ 20.59. In other words, if the tenant has not foregone the benefit of exclusive possession and control of the property afforded to her under the lease by either abandoning or surrendering the leasehold interest, the lessor is entitled to the rent the tenant agreed to pay for the benefit conferred. *M & V Barocas v. THC, Inc.*, 216 Mich.App. 447, 450, 549 N.W.2d 86 (1996). Abandonment of the right of occupancy under a lease requires both proof of intent to abandon and acts of abandonment. *Fera v. Village Plaza, Inc.*, 52 Mich.App. 532, 538, 218 N.W.2d 155 (1974) (*rev on other grounds* 396 Mich. 639, 242 N.W.2d 372 (1976)).

 An abandonment of the leasehold does not excuse the tenant of liability for the remaining rental payments owing on the lease at the time of the abandonment. *Scott v. Beecher*, 91 Mich. 590, 52 N.W. 20 (1892). The landlord continues to have a claim for these future rents subject to any offset for the rents received by the landlord if the property is re-let during the remainder of the lease term. *Stewart v. Sprague*, 71 Mich. 50, 38 N.W. 673 (1888). Moreover, the landlord has a duty to mitigate by making a reasonable effort to re-let the property once it has been abandoned. *Froling v. Bischoff*, 73 Mich.App. 496, 252 N.W.2d 832 (1977).[16]

15. If a trustee is obligated to continue honoring the rental obligation under a leasehold interest the estate required from the debtor pursuant to Section 541(a)(1), then it follows that the landlord or other lessor must have a claim against the estate for the rent which continues to accrue post-petition on account of that leasehold interest. The question which springs from this logical conclusion is "how is this claim for post-petition rents treated under the Bankruptcy Code?" Although a simple and straightforward question, the courts and commentators have ignored it by subsuming it within the more immediate question which typically accompanies it, that being whether this post-petition claim for rent should be afforded administrative priority if the trustee ultimately rejects the lease agreement she acquired from the debtor. Unfortunately, Sections 365 and 503 unduly complicate the analysis. Therefore, I have chosen to analyze the question first by assuming that Sections 365 and 503 are not applicable and then re-introducing these sections onto the equation once my preliminary analysis has been completed.

16. The law in Michigan for leases of personal property is similar. Michigan adopted Article 2A of the Uniform Commercial Code in 1992 (MCLA 440.2801–2982). It applies to all leases of goods. MCLA 440.2802 and 2803(j). If goods subject to a lease have been delivered to the lessee, the lessor is entitled to recover

Therefore, if Section 541(a)(1) were the only applicable section and consequently nothing more resulted from the debtor's bankruptcy filing than the simple substitution of the bankruptcy estate for the debtor on the lease, then the estate would continue to be obligated for the actual rent accrued on the lease until the leasehold interest was abandoned. If the trustee elected to abandon the lease, the lessor would have two separate claims against the estate. The first claim would be the lessor's claim against the debtor for unpaid rents, if any, which had accrued prior to the debtor's petition. The second claim would be the lessor's post-petition claim against the estate itself. One component of the lessor's post-petition claim would be any unpaid rents which accrued post-petition before the trustee elected to abandon the estate's interest in the leasehold. The other component of the lessor's post-petition claim would be its damage claim for future rents which remained owing under the lease agreement at the time the trustee abandoned the leasehold interest.[17]

Having established this basic conceptual framework, the next step is to consider how either Section 365 or Section 502 affects the outcome I have described. Somewhat surprisingly, Section 365 is largely irrelevant. As already discussed, Section 365 for the most part addresses when an unexpired lease must be assumed, what types of unexpired leases may be assumed and what types may not, and what the trustee must do to assume or assign an unexpired lease. Only subsec-

tion (g) is relevant to the question I have posed.

(g) Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition[.]

11 U.S.C. § 365(g)(1).

Courts and commentators typically focus on the relation-back aspect of this provision. However, subsection (g) serves a second, equally important function: it defines what rejection of an unexpired lease means. Rejection of an unexpired lease is not the equivalent of termination of the lease. Rejection of the unexpired lease is not even the same as abandonment of the unexpired lease. Rather, rejection of the lease means nothing more than that the trustee has **breached** the terms of the lease. *Miller v. Chateau Communities, Inc. (In re Miller)*, 282 F.3d 874, 877 (6th Cir.2002).

Section 502(g) complements Section 365(g)(1) by setting forth how a claim arising from the rejection of an unassumed and unexpired lease is to be administered.

**A claim arising from the rejection** ... of an executory contract or unexpired lease of the debtor that has not been assumed ... shall be allowed ... or

---

all accrued and unpaid rent on the lease up to the date the lessee tenders the goods back to the lessor and the present value of all future mitigated rents. MCLA 440.2978(1).

"Tender" is not defined in Article 2A. However, Article 2 (Sales) defines "tender or delivery" as putting and holding "conforming goods at the buyers disposition" and giving "the buyer any notification reasonably neces-

sary to enable him to take delivery." MCLA 440.2503(1).

17. The lessor's pre-petition and post-petition claims might also include a second and separate component for damages if the condition of the subject property recovered by the lessor was less than what had been agreed to by the lessee under the lease agreement.

disallowed ... the same **as if** such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(g) (emphasis added).

In other words, if an unexpired lease is rejected sometime after it has become property of the estate, then Section 502(g) combines with Section 365(g)(1) to provide that the damages resulting from rejection/breach of the lease (*i.e.*, the future rents due for the remaining term of the lease) will be administered as a pre-petition claim. A Section 502(g) claim is described in the legislative history as a "rejection claim." House Report No. 95–595, 95th Cong., 1st Sess. 349 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6305; Senate Report No. 95–989, 95th Cong., 2nd Sess. 60 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5846. A rejection claim is distinct from other post-petition claims a lessor may have against the estate. For example, a rejection claim would not include any claim a lessor might have for damages by the trustee's post-petition misuse of the subject property.

Even more important, a rejection claim would not include a lessor's post-petition claim for the unpaid rents which accrued after the commencement of the bankruptcy but **prior** to the rejection of the lease. A rejection claim is prospective only. It covers only that portion of the lessor's post-petition claim relating to the future rents which the lessor would have received had the lease not been rejected.

Subsection (g) gives entities injured by the rejection of an executory contract or unexpired lease ... a pre-petition claim **for any resulting damages** ...

House Report No. 95–595, 95th Cong., 1st Sess. 354 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6310; Senate Report No. 95–989, 95th Cong., 2d. Sess. 65 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5851.[18]

To summarize, the bankruptcy estate, by acquiring the debtor's leasehold interest under an unexpired lease at the outset of the bankruptcy proceeding, must in some fashion account for the post-petition accrual of rents associated with the leasehold interest it has acquired. If only state law applied, then the estate would be accountable to the landlord for all accrued but unpaid rents up to the point the subject property is surrendered or repossessed. The estate would also be liable for the future rental payments due for the remaining term of the lease, subject, however, to the lessor's duty to mitigate.

The Bankruptcy Code alters this outcome in two ways. First, it provides that if the claim for unpaid rents includes rents which accrued prior to the commencement of the bankruptcy, the pre-petition unpaid rents are to be treated as a claim against the debtor and allowed or disallowed pursuant to Section 502(b). *See also*, 11 U.S.C. § 101(5), (10), and (12). Second, it provides that if the unexpired lease is ultimately rejected by the estate as provided

---

**18.** If the estate were to abandon the leasehold interest at the same time that the lease was rejected, then the lessor's Section 502(g) rejection claim would be limited to the future rents owing for the remaining term of the lease reduced by the lessor's duty to mitigate. If, however, the estate did not abandon the leasehold interest simultaneously with the rejection but instead remained in control (*e.g.*, the lease was automatically rejected by operation of Section 365(d)(1)), then the lessor's Section 502(g) rejection claim would be for whatever actual rent accrued between the date of rejection and the date the estate abandoned the leasehold interest and for whatever future mitigated rents might be due after the date of abandonment.

in Section 365, then the lessor will have a "rejection claim" [19] against the estate which also is to be administered as a pre-petition claim. 11 U.S.C. §§ 502(g) and 365(g).

However, neither Section 502 nor Section 365 addresses how the lessor's claim for unpaid post-petition rents which accrued during the "petition/rejection gap" (*i.e.*, the post-petition period **prior** to the lease's rejection) are to be administered.[20] Section 503(b)(1), on the other hand, suggests that any unpaid, post-petition rent which accrued prior to the lease's rejection

---

19. *i.e.*, a composite claim consisting of 1) a mitigated damage claim for unearned lease payments over the remainder of the lease after the subject property is abandoned or repossessed; and 2) a claim for actual post-petition rents for the interval, if any, between the rejection date and the date the subject property is either abandoned or repossessed.

20. At first blush, Section 502(g), when combined with Section 502(b)(6), suggests that the claim for unpaid post-petition rents which accrued prior to rejection of the lease is to be incorporated into the pre-petition claim for damages. However, the actual wording of these sections does not support such a conclusion. Section 502(b)(6) is very specific as to the type of claim which falls within its pur-view.

> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
>> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
>>> (i) the date of the filing of the petition; and
>>> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates[.]

11 U.S.C. § 502(b)(6).
Only claims "for damages resulting from the **termination** of a lease of **real property**" are covered. Therefore, damage claims arising from leases of equipment and other personal property are outside the scope of Section 502(b)(6). As for real property leases, claims arising from leases which are not in default as of the *petition date are not subject to* Section 502(b)(6). Indeed, claims arising from leases which are in default but not yet terminated as of the petition date are not subject to Section 502(b)(6). Section 502(b)(6) only covers those instances where a real property lease has in fact been terminated (either by the lessee's voluntary abandonment or the lessor's successful efforts in state court) prior to the commencement of the bankruptcy case. If the lease has not been terminated pre-petition, then the lease remains an unexpired lease which transfers to the estate by operation of Section 541(a)(1).

The trustee, of course, has the option of rejecting any unexpired lease post-petition. However, Section 502(g), not Section 502(b)(6), addresses how the resulting rejection claim is to be administered. As already discussed, that section makes no reference to the lessor's separate claim for unpaid post-petition rents which accrued during the petition/rejection gap. It refers only to the lessor's claim for **post-rejection** rents due under the lease.

Section 502(g) further directs that the rejection claim is to be administered "as if" the claim had arisen pre-petition. Since rejection under Section 365(g)(1) constitutes nothing more than a breach of the lease agreement, and since a breach of the lease agreement *is* not the same as termination of the lease itself, the pre-petition equivalent of a rejection claim is not a claim based upon a lease which in fact has been terminated but rather a claim based upon a lease which is only in default. Therefore, Section 502(b)(6), which is limited to only claims based upon leases which have been terminated, has no direct applicability to *either the determination or allowance of a* rejection claim. At most, Section 502(b)(6) offers guidance as to the maximum amount which a lessor may be allowed to recover for future rents owing on the remaining term of an unexpired real property lease which the estate has rejected post-petition. What is absolutely clear is that Section 502(b)(6), whether considered alone or in conjunction with Section 502(g), has nothing to do with how a lessor's claim for unpaid post-petition rents which accrued prior to the lease's rejection is to be administered by the estate.

should be allowed as an administrative expense.

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.]

11 U.S.C. § 503(b)(1)(A).

Given that a debtor's leasehold interest in an unexpired lease constitutes property of the estate, it stands to reason that the actual rental payments associated with that leasehold interest would be a necessary cost associated with the preservation of that particular property interest. Put differently, the trustee must pay the actual rental payments required under the lease agreement if the trustee wishes to preserve for the estate the benefits of the leasehold interest acquired from the debt-

or.[21] Otherwise, the lessor will have the right to terminate the lease and repossess the subject property.

It further stands to reason that this administrative cost terminates when the leasehold interest is rejected, either by affirmative act under Section 365(a) or by operation of Section 365(d), for rejection of the unexpired lease is an unequivocal manifestation of the estate's decision that it is no longer in the estate's interest to preserve the exclusive right to possess and use the property which is subject to the leasehold interest. Consequently, rents which accrue on account of a lease subsequent to its rejection should not be entitled to administrative priority. Indeed, Sections 365(g) and 502(g) confirm this reasoning through their mandate that post-

---

**21.** My conclusion that the Bankruptcy Code requires the trustee to pay the actual rent under the lease agreement as the cost of preserving the leasehold interest during the petition/rejection gap does not mean that the trustee must necessarily tender payment to the lessor immediately as the rent comes due. First, from a practical point of view, immediate payment becomes an issue only if the lessor seeks to enforce its rights through either a motion to compel the trustee to assume or reject the lease or a motion for relief from the automatic stay or the trustee seeks an extension of the time to assume or reject and the lessor objects. If the lessor is complacent, then the rent will simply accrue as an administrative claim against the estate in the same manner as rent would accrue as a claim against the debtor pre-petition had the debtor stopped paying rent but had remained in possession of the leased property.

Second, even if the lessor is not complacent, there is sufficient flexibility in the Bankruptcy Code to allow the trustee in most instances at least some time to offer the lessor an administrative claim in lieu of immediate payment of the rent due. Sections 365(d)(3) and (d)(10) certainly suggest by negative implication that a Section 503(b)(1)(A) administrative claim remains an acceptable alternative to actual payment of post-petition rent for

leases of non-commercial real and personal property and an acceptable alternative for leases of commercial personal property for the first sixty days after the order for relief in a Chapter 11 proceeding and for an unspecified period of time under all other chapters of the Bankruptcy Code. Whether allowance of an administrative claim is acceptable as a substitute for immediate payment should be decided on a case-by-case basis. Relevant factors could include the ability of the estate to ultimately pay the administrative claim, the lessor's need for immediate payment, and the potential value of the lease to the estate if the trustee ultimately were to assume it.

I also do not rule out the possibility that lessors could receive a combination of immediate payment and an administrative claim in those instances where it might be appropriate to substitute an administrative claim for actual payment of the rent due (*i.e.* all instances other than leases involving commercial real property). For example, the court could require the trustee to immediately pay that portion of the rent due on a commercial equipment lease in a Chapter 7 which would be needed to cover the actual depreciation or opportunity cost associated with the estate's continued possession of the subject property but allow the remainder of the rent due, if any, as an administrative claim to be paid at a later date.

rejection claims for rent (*i.e.*, rejection claims) are to be treated as pre-petition claims, not post-petition claims.

Unfortunately, there are numerous decisions which contradict this logic. *See, e.g., In re Bridgeport Plumbing Products, Inc.,* 178 B.R. 563, 565–6 (Bankr.M.D.Ga.1994); *Burlington Northern Railroad Co. v. Dant & Russell, Inc., (In re Dant & Russell, Inc.)* 853 F.2d 700, 707 (9th Cir.1988); *Memphis–Shelby County Airport Authority v. Braniff Airways, Inc., (In re Braniff Airways, Inc.),* 783 F.2d 1283, 1285–6 (5th Cir.1986); *In re Energy Resources Co., Inc.,* 47 B.R. 337, 338 (Bankr.D.Mass. 1985). They uniformly hold that a lessor's administrative expense claim for rents during the petition/rejection gap for a lease which is ultimately rejected is limited to the reasonable rental value of the property subject to the lease.[22]

The problem with these decisions is that they leave unaccounted for a residual, post-petition claim. This residual claim is the difference between the reasonable rental value which is to be allowed as the post-petition administrative priority claim and the actual rent which accrued under the lease agreement during the petition/rejection gap. The instinctive response is that this residual claim is included as part of the post-petition rental claim which is treated as a pre-petition claim pursuant to Section 502(g). However, Section 502(g) addresses only that portion of the post-petition rents which arose **AFTER** the lease was rejected.[23]

The numerous courts which have decided that an administrative rent claim under the Bankruptcy Code must be limited to the reasonable rental value of the property have simply ignored the existence of this residual claim. Indeed, these courts have, for the most part, offered no critical analysis at all concerning the allowance of an administrative claim for rents which accrued during the petition/rejection gap. Comment is typically limited to recognition of "reasonable rental value" as being the well accepted rule and citation of one or more previously published decisions to establish the point.[24]

---

**22.** This is not to say that the courts which have addressed the allowance of unpaid rents during the petition/rejection gap as an administrative expense are unanimous. They are anything but. However, the battlefield they have chosen for their debate is confined to what should be allowed as the reasonable rental value for the subject property during this gap period. One camp argues that a court should consider only the fair rental value of the subject property based upon its best use (the "objective" standard) see, e.g., *Thompson v. IFG Leasing Co. (In Re Thompson),* 788 F.2d 560, 563 (9th Cir.1986) whereas the other camp argues that a court should also consider an estate's actual use of the property (the "subjective" standard). *See, e.g., In re Bridgeport Plumbing Products, Inc.,* at 566. However, regardless of the standard used, the courts uniformly state that the lease payment actually required by the underlying lease is relevant to consideration of the administrative priority claim only as being representative of what the subject property's reasonable rental value may be.

**23.** *See* pp. 885–86, *supra.*

**24.** For example, *Memphis–Shelby County Airport Authority v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 783 F.2d 1283 (5th Cir.1986), *In re Rhymes, Inc.,* 14 B.R. 807 (Bankr.D.Conn.1981), and *In re Standard Furniture Company,* 3 B.R. 527 (Bankr.S.D.Cal. 1980) are three frequently cited cases for the rule that the administrative claim for rents which accrued during the petition/rejection gap is to be limited to the reasonable rental value of the subject property. None of these cases offers any independent analysis. Rather, each relies solely upon prior case law as support for the rule advanced.

If the trustee assumes the lease, the debtor's estate becomes liable for the full rent accruing under the terms of the lease. *In re Florida Airlines, Inc.,* 17 B.R. 683, 684 (Bankr.M.D.Fla.1982). If the trustee ulti-

However, I am reluctant to conclude that this residual claim just disappears, particularly given the fact that the Bankruptcy Code would require this very same residual claim to be paid in full had the trustee elected to assume the unexpired lease.[25] Therefore, I have chosen to ex-

mately rejects the lease the debtor's estate is liable only for the reasonable value of its use and occupancy of the premises. The lessor is entitled to receive administrative expense priority for that amount (*see* § § 503 and 507(a)(1) of the Bankruptcy Code) which is ordinarily presumed to be the contract rental rate, adjusted downward or upward to reflect the extent to which the debtor actually used the demised premises. *In re Energy Resources Co., Inc.,* 47 B.R. 337, 338–39 (Bankr.D.Mass.1985); *Dallas–Fort Worth Regional Airport Board v. Braniff Airways, Inc.,* 26 B.R. 628, 630–31 (N.D.Tex.1982) [hereinafter cited as *DFW Regional Airport Board*]; *In re Standard Furniture Company,* 3 B.R. 527, 530 (Bankr.S.D.Cal.1980); *see generally* Fogel, Executory Contracts and Unexpired Leases in the Bankruptcy Code, 64 Minn.L.Rev. 341, 365–71 (1980).

Because this claim for use and occupancy is given administrative expense status, it is sometimes known as "administrative rent." *DFW Regional Airport Board, supra,* 26 B.R. at 630. A claim for administrative expense determines not only the sum to which the lessor is entitled, but also the priority to which he is entitled. If granted administrative expense priority, his claim will often disadvantage the general creditors of the estate. *S & W Holding Company v. Kuriansky,* 317 F.2d 666, 667 (2d Cir.1963).

*In re Braniff Airways,* 783 F.2d at 1285–86.

With respect to unexpired leases, it is well settled that until assumption or rejection of the debtor's lease, the estate is liable only for the reasonable value of the use and occupancy of the property. *In re United Cigar Stores Co.,* 69 F.2d 513 (2d Cir.), *cert. denied sub nom. Reisenwebers, Inc. v. Irving Trust Co.,* 293 U.S. 566, 55 S.Ct. 76, 79 L.Ed. 665 (1934); *In re Standard Furniture Co.,* 3 B.R. 527 (Bankr.S.D.Cal.1980).

*In re Rhymes, Inc.,* 14 B.R. at 808.

Where an unexpired lease is eventually adopted by the trustee, the estate becomes liable to the lessor for rent reserved in the lease accruing from the date of filing the petition until the date of assumption. See *In re Chase Commissary Corporation, supra,* 11 F.Supp. at 289. See also 2 Collier on Bankruptcy, P 365.03(2) at p. 365–25 (15th

ed.). It is well settled, however, that where a lease is ultimately rejected, or for the period pending either rejection or assumption, the amount of allowable expense for administrative rent is measured by the period of actual occupation and use of the premises. See *Philadelphia Co. v. Dipple,* 312 U.S. 168, 174, 61 S.Ct. 538, 541, 85 L.Ed. 651 (1941) (reorganization case); *Matter of Chase Commissary Corporation, supra,* 11 F.Supp. at 289; *In re CRS Architectural Metals Corp.,* 1 B.R. 729, 732 (Bankr.E.D.N.Y.1979).

*In re Standard Furniture Company,* 3 B.R. at 530.

**25.** I cannot find any provision in the Bankruptcy Code which would adequately address the administration of this residual claim. The Bankruptcy Code provision which comes closest to providing an answer is Section 348(d).

> (d) A claim against the estate or the debtor that arises after the order for relief but before conversion in a case that is converted under section 1112, 1208, or 1307 of this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition.

11 U.S.C. § 348(d). If the administrative claim for pre-rejection rents is to be limited to the reasonable rental value of the subject property, then the residual claim for the difference between the actual rent and the reasonable rent would be "a claim against the estate" which would be subject to pre-petition treatment. However, Section 348(d) addresses only that portion of the residual claim which arose pre-conversion. If the lease was rejected prior to conversion, then the residual claim could be accounted for by Section 348(d) as just another post-petition claim which is now to be treated as a pre-petition claim. However, if the lease had not been rejected as of the date of conversion, the residual claim related to the unpaid rents which accrued prior to conversion would be subject to pre-petition treatment pursuant to Section 348(d) but any residual claim related to unpaid rents which accrued in the subsequent Chapter 7 proceeding

amine more closely the basis for the seemingly unassailable rule that a lessor's administrative priority claim for unpaid rents under the Bankruptcy Code must be limited to the reasonable rental value of the property. What I have discovered is that all of the Bankruptcy Code decisions which have espoused this rule have relied upon case law which ultimately is based upon the interpretation of the former Bankruptcy Act of 1898, not the current Bankruptcy Code. The reliance is misplaced.

Unexpired leases and, executory contracts were not considered property of the estate under the former Bankruptcy Act until the trustee assumed the contract or lease. *In re Frazin,* 183 F. 28 (2d Cir. 1910).

> In our opinion, upon principle and authority, a trustee, having the option to assume or reject a lease, takes title to such lease only in case he elects to accept it. If he elects to accept it, then, by virtue of the provision of the bankruptcy act already quoted, the vesting of the title relates back to the date of adjudication. But, if the trustee does not elect to accept the lease, it remains the property of the bankrupt.

*Id.* at 32.[26]

The *Frazin* court reached this conclusion as a matter of statutory interpretation, not as a matter of common law or equity. It observed that Section 70a of the former Bankruptcy Act was patterned after the English laws in existence at the time of its original enactment and that those laws did not automatically vest in the bankruptcy trustee the debtor's unexpired lease interest.

> The general assignment of a bankrupt's personal estate under the commission does not vest a term of years in the assignee, unless they do some act to manifest their assent to the assignment as it regards the term, and their acceptance of the estate, rents, etc. And therefore till some act of this sort is done by them, the term still remains in the bankrupt, and he is liable to the payment of rent accruing due subsequent to the bankruptcy.

*Id.* at 30 (citing Lord Ellenborough's opinion in *Copeland v. Stevens,* 1 B. & Ald. 593 (1818)).

The *Frazin* court further observed that various American courts had already incorporated this exception into the Bankruptcy Act of 1867.

> It is well settled that assignees in bankruptcy are not bound to accept property which, in their judgment, is of an onerous and unprofitable nature, and would burden instead of benefit the estate, and can elect whether they will accept or not after due consideration and within a reasonable time, while, if their judgment is unwisely exercised, the bankruptcy court is open to compel a different course.

*Id.* at 30 (citing *Dushane v. Beall,* 161 U.S. 513, 515, 16 S.Ct. 637, 638, 40 L.Ed. 791 (1896)).

Therefore, courts which were asked to determine a lessor's entitlement under the former Bankruptcy Act to rents which had accrued during the petition/rejection gap addressed this issue from the perspective

---

would still be unaccounted for. Of course, Section 348(d) becomes irrelevant if the actual rent accrued during the petition/rejection gap, as opposed to just the reasonable rent, is simply entitled to administrative priority pursuant to Section 503(b)(1)(A).

**26.** *See also, Fletcher v. Surprise (In re Northern Indiana Oil Co., Inc.),* 180 F.2d 669, 676 (7th Cir.1950); *Reisenwebers, Inc. v. Irving Trust Co. (In re United Cigar Stores Co. of America),* 69 F.2d 513, 515 (2d Cir.1934).

that the estate did not become a party to the lease until the trustee actually made an affirmative, post-petition decision to include the debtor's leasehold interest as part of the bankruptcy estate. If the trustee elected to accept (*i.e.,* assume) the leasehold interest, then the estate was deemed to be liable for all unpaid rents which had accrued from the inception of the bankruptcy proceeding as if title had vested to the estate on that prior date. However, if the trustee elected to reject (*i.e.,* not accept) the lease, then the estate would not be liable for the actual rents which accrued post-petition for the simple reason that the estate never became a party to the lease agreement. The lessor's claim for actual rent remained against the debtor.

However, these same courts concluded that the lessor of an unexpired lease which was rejected under the former Bankruptcy Act held a separate claim against the estate. This separate claim against the estate did not arise out of the lease agreement itself. Again, the lessor's claim for post-petition rents under the rejected lease agreement remained against the debtor. Rather, the lessor's claim for post-petition rent against the estate arose out of the equitable principle that the estate should not be unjustly enriched if it benefitted from the use of the subject property. *In re United Cigar Stores Co. of America,* 69 F.2d at 515; *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.,* 280 F.2d 119, 124–5 (2d Cir. 1960); *Zelin v. Unishops, Inc. (In re Unishops, Inc.),* 553 F.2d 305, 308 (2d Cir. 1977); *Hall v. Perry (In re Cochise College Park, Inc.),* 703 F.2d 1339, 1352 (9th Cir. 1983) (Act case).

> Section 64, sub. a(1) includes among those claims entitled to first priority the 'actual and necessary costs and expenses of preserving the estate subsequent to filing the petition' and 'the costs and expenses of administration.' The claim of a creditor having an executory contract with the debtor at the time the debtor's petition is filed is entitled to priority under these provisions only if the trustee or debtor in possession elects to assume the contract or if he receives benefits under it. **The right to priority in the event the contract is assumed follows from the fact that the trustee or debtor in possession has elected to make the contract of the debtor his own, just as if it had been made by the trustee or debtor in possession in the first instance. The right to priority in the event the trustee or debtor in possession receives benefits under the contract during the interval between the filing of the debtor's petition and the rejection of the contract 'is an equitable right based upon the reasonable value' of the benefits conferred, rather than upon the contract price.** Where no benefits are received by the bankrupt estate or its representative under the contract, and the contract is not assumed, the creditor's claim is not entitled to priority, although of course, upon rejection, the creditor may file a general claim against the estate. These principles have most often been applied by the courts with respect to leases of real property. In such cases it is said that, unless the trustee or debtor in possession elects to assume the duties of the bankrupt lessee under the lease, he is liable only for actual use and occupancy of the property.

*American Anthracite & Bituminous Coal Corp.,* 280 F.2d at 124–125 (citations omitted).

Courts have continued to cite Bankruptcy Act cases such as American Anthracite, *United Cigar Stores,* and *Cochise College Park, Inc.,* for the proposition that a les-

sor's administrative rent claim on account of a rejected lease was limited to the subject property's reasonable rental value even after the Bankruptcy Code had replaced the Bankruptcy Act as the applicable law. *In re Bridgeport Plumbing Products, Inc.*, 178 B.R. 563 (Bankr.M.D.Ga.1994) (citing *American Anthracite*); *In re Rhymes, Inc.*, 14 B.R. 807 (citing *United Cigar Stores* and *American Anthracite*); *Dallas–Fort Worth Regional Airport Board v. Braniff Airways, Inc.*, 26 B.R. 628 (citing *United Cigar Stores, Inc.*); *Burlington Northern Railroad Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700 (citing *Cochise College Park, Inc.*). However, the Bankruptcy Code eliminated the theoretical construct upon which *American Anthracite, United Cigar Stores*, and *Cochise College Park, Inc.* had all been based. Each of these pre-Code decisions had been premised upon two well established principles under the former Bankruptcy Act: first, that a leasehold interest did not become property of the estate under former Section 70a until the bankruptcy trustee elected to assume the underlying lease agreement; and second, that any post-petition claim against the estate on account of property subject to an unexpired lease which had been rejected (*i.e.*, not accepted) by the estate must be based upon the equitable theory of unjust enrichment. It necessarily followed from these two principles that the reasonable rental value of the subject property based upon the estate's actual use of that property would dictate the amount of the lessor's separate claim for unjust enrichment against the estate. The actual rent agreed upon by the lessor and the debtor under the rejected lease was relevant only to the extent that it reflected the property's reasonable rental value.

However, as already discussed, the Bankruptcy Code provides that a debtor's leasehold interest, like every other interest owned by the debtor, becomes property of the estate upon the commencement of the case. Ironically, the logic which supported the decisions reached in *United Cigar Stores, American Anthracite* and *Cochise College Park* now requires exactly the opposite conclusion. If a leasehold interest becomes property of the estate at the commencement of the case, then the estate is obligated for the actual rent associated with the leasehold interest until the trustee elects to abandon (or reject) the lease. Indeed, the court in *Frazin* foresaw the consequences of accelerating the "vesting" of a leasehold interest in the bankruptcy estate from the trustee's acceptance of the lease to the commencement of a bankruptcy proceeding.

> Now, if the title to a lease passes nolens volens [*i.e.*, by operation of law] to the trustee immediately upon his appointment, he has not the election which the Supreme Court says that he has of accepting it or not. His only option is to retain it or convey it back to the bankrupt, which is a very different thing. **Moreover, if the bankrupt be divested of his interest in the leasehold estate, and it be vested in the trustee immediately upon his appointment, it is difficult to see upon what theory he can escape its obligations pending its retransfer.** And if reconveyance be necessary, upon what principle can the bankrupt be compelled to accept it?

*In re Frazin*, 183 F. 28 at 31–32 (emphasis added).

*In re Fred Sanders Company*, 22 B.R. 902 (Bankr.E.D.Mich.1982) is the only post-Bankruptcy Act case which I have discovered which recognizes the problem posed by enactment of Section 541(a)(1) upon the allowance of administrative rent at some amount other than the contractual rate. *Id.* at 903–05. *Sanders* concluded that the Bankruptcy Code continues to

limit a lessor's administrative priority claim on account of a rejected lease to the reasonable rental value of the property notwithstanding the enactment of Section 541(a)(1). It offered two rationales for this conclusion. I disagree with both.

First, *Sanders* concluded that *Frazin* and all of the other Bankruptcy Act cases which had held that a debtor's interest in an unexpired lease did not automatically pass to the bankruptcy estate had been wrongly decided.

> The difficulty with this analysis [that a leasehold interest does not become property of the estate until the bankruptcy trustee accepts it] is that it ignores section 70a, which provides that a trustee was 'vested by operation of law with the title of the bankrupt as of the date of the filing of the petition' to all property of the debtor. Section 70a did not except executory contracts or leases from its scope.

22 B.R. at 904.

As proof that these courts had misinterpreted former Section 70a, *Sanders* cited language from *Frazin* itself:

> Courts were not unaware that they were ignoring the express language of section 70a.
>
> [I]t is said, however, that this conclusion (that leases do not automatically vest in the trustee) is at variance with the express provision of the bankruptcy act that all the estate of the bankrupt shall vest in the trustee as of the date of the adjudication; that a leasehold interest is property and must necessarily pass with all other property. In our opinion, how-

ever, the provisions of the bankruptcy act must be read in view of the principles stated in many decisions and expressly recognized in the English bankruptcy statutes that there is a distinction between property which may be burdensome to an estate and that which is manifestly beneficial to it. The latter, of course, passes upon the adjudication. The former passes only when accepted by the trustee[.]

22 B.R. at 904.

However, the Supreme Court has validated the analytical technique utilized by the Second Circuit in *Frazin* to interpret former Section 70a. *Dewsnup v. Timm*, 502 U.S. 410, 419–20, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992). In *Dewsnup*, the Court held that amendments to the bankruptcy laws must be interpreted consistent with existing bankruptcy practice absent at least some indication from Congress that it intended to change that practice. The *Frazin* court did not reach the conclusion that it did in a vacuum. Rather, it compared the bankruptcy laws enacted by Congress with the English statutes and common law from which they had been derived. The *Frazin* court observed that English law at that time did not regard a potentially burdensome leasehold interest as property of the estate until the estate accepted the lease notwithstanding the general rule that the property of the debtor was to vest with the estate upon the commencement of the debtor's bankruptcy. It therefore reasonably concluded that Congress intended a similar exception when it originally enacted Section 70a as part of the Bankruptcy Act of 1867.[27]

---

27. The *Frazin* court was interpreting the Bankruptcy Act of 1898, not the Bankruptcy Act of 1867. However, it concluded that Section 70a under the 1898 Act was substantially the same as Section 70a under the 1867 Act. 183 F. at 31. Interestingly, the *Frazin* court observed that Parliament had amended Eng-

land's bankruptcy statutes sometime after the enactment of the 1867 Act to include a debtor's leasehold interest in the estate immediately upon the inception of the bankruptcy proceeding. Moreover, this subsequent amendment provided that the English bankruptcy trustee was liable for the post-petition

Second, *Sanders* declared that the Bankruptcy Code itself freed courts from having to rely upon "the fiction of delayed vesting" in order to limit administrative rent claims on rejected leases to fair rental value. *Sanders* "reconciled" the problem of the estate immediately acquiring under Section 541(a)(1) the rights associated with a debtor's leasehold interest without also having to immediately honor the obligations associated with those rights by finding a dichotomy between the acquisition of rights under Section 541(a)(1) and the assumption of obligations under Section 365.

> There is no need to resort to the fiction of delayed vesting under the Code to reach the result that a trustee is not bound by an existing lease until he affirmatively adopts the lease. The debtor's estate consists of 'all legal or equitable interests of the debtor in property as of the commencement of the estate.' Section 541. The legislative history states that the 'debtor's interest in property also includes 'title' to property, which is an interest, just as are a possessors interest, or a leasehold interest.' Clearly, therefore, upon the filing of the bankruptcy petition, a lease becomes property of the estate. Section 541, however, must be read in conjunction with section 365(a), which provides that the debtor may assume or reject any existing lease. The right to assume presupposes that assumption does not automatically take place upon the filing of the bankruptcy petition, and the right to reject presumes the existence of something which can be rejected. The apparent conflict between section 541 and section 365 is readily reconcilable. A lease has two aspects-the lessee's right to possession and use, and his correlative obligation to make the agreed-upon lease payments. The debtor lessee's right to possession and use of the leased property becomes part of the estate. **The debtor, however, is not liable for the payments provided for under the lease until the lease is assumed. Until the lease is assumed, the estate is liable only for the reasonable value of the leased property-the same obligation which existed under equity receiverships and the Bankruptcy Act.**

22 B.R. at 904–05 (citations omitted) (emphasis added).

*Sanders'* reconciliation of Section 541(a)(1) and Section 365 is forced at best. Moreover, it is not necessary. It is premised upon the assumption that it is inherently wrong for the lessor to receive anything more than reasonable rental value as an administrative claim for a lease which has been rejected. However, nothing in the Bankruptcy Code dictates this result. Indeed, *Sanders* itself acknowledges that Section 365, which is the Bankruptcy Code provision most likely to require such a result, does not address the "reasonable value" question at all. 22 B.R. at 905 n. 7.[28] As already discussed, the current rule

---

rents accruing on account of that leasehold interest until the trustee disavowed the lease. *Id.* at p. 30. However, the *Frazin* court concluded that the statutory scheme adopted by Congress in 1867 was patterned after the bankruptcy laws which were in effect in England in 1867 and that Congress had not expressed any intention to alter that scheme when it amended the bankruptcy laws in 1898. *Id.*

**28.** *Sanders* was decided prior to the enactment of both Section 365(d)(3) and Section 365(d)(10). However, neither of these sections creates an administrative priority claim for unpaid rents during the petition/rejection gap. *See* pp. 873–77, *supra.* It is unlikely that the court in *Sanders* would have changed its concession concerning Section 365 and the "reasonable value" question had it rendered its decision after the enactment of either of these sections.

limiting the administrative rent claim to fair rental value is a consequence of how unexpired leases were administered under the former Bankruptcy Act. Its purpose was to protect the lessor from the estate unfairly benefitting through the use of leased property during the period prior to the estate's ultimate decision not to make the lease part of the estate. However, this inequity has been eliminated under the Bankruptcy Code by the incorporation of the leasehold interest as part of the bankruptcy estate from the outset of the proceeding. The "neutral transfer" principle underlying Section 541(a)(1) requires the trustee to pay the lessor the actual rent due under the lease from the inception of the bankruptcy proceeding. The trustee's obligation ceases only when she determines that the lease has no value or is otherwise burdensome to the estate and therefore rejects it.

*Sanders* also poses several analytical problems. For example, if the debtor's property interest created by the leasehold interest in fact is to be separated from the debtor's obligations under the lease agreement for purposes of the Bankruptcy Code, one must question whether the lessor is even entitled to any rent during the post-petition interval before the trustee elects to reject that interest. Logic suggests that this "separate" property interest should be administered no differently than any other interest of the estate which is unencumbered by an interest or obligation. The aggrieved lessor would certainly continue to have the right to accelerate the trustee's duty to decide whether to assume the obligation to pay rent or not by filing a motion to assume or reject under Section 365 or a motion for relief from stay under Section 362. However, the lessor would be left with no recourse in the inter-

im to recover for the trustee's continued possession of its property.

In addition, the construct chosen by *Sanders* works well for unexpired leases. However, Section 365 also includes land contracts [29] and other executory contracts. With respect to land contracts, the dichotomy proposed in *Sanders* would permit the land contract vendee to remain in possession of the subject property without obligation for whatever period the court might allow. As for an executory contract for the provision of services, the *Sanders* solution suggests that a trustee who succeeded to the debtor's right to receive services under the contract could compel the other party to provide those services during the interval before the trustee ultimately decided not to assume debtor's obligation to pay under the agreement without having to pay the contracted for price. At best, the other party would be able to file a claim for the fair value of the services provided.

Executory contracts and unexpired leases cannot be dissected into separate bundles of rights and obligations, each of which is to be administered apart from the other. Executory contracts and unexpired leases are by their very nature a combination of rights and obligations which are inextricably related. A debtor's rights under an executory contract or unexpired lease must be conditioned upon some corresponding obligation of the debtor. If that conditional relationship is not present, then there can be no executory contract or unexpired lease. Therefore, the dichotomy which the court in *Sanders* used to rationalize the allowance of administrative rent at only its reasonable value is invalid.

I recognize that allowing an administrative rent claim based upon the agreed rental rate as opposed to the reasonable

---

**29.** *Terrell v. Albaugh (In re Terrell)*, 892 F.2d 469 (6th Cir.1989).

rental value appears to run afoul of *Dewsnup v. Timm.* Again, *Dewsnup* held that courts must interpret the Bankruptcy Code in such a manner as to be consistent with bankruptcy practice as it existed when the Bankruptcy Code was enacted. I concede that the bankruptcy practice in 1980 was to limit administrative rent claims to the reasonable rental value of the subject property. However, *Dewsnup* also directs that "[w]here the language [in the Code] is unambiguous, silence in the legislative history cannot be controlling." 112 S.Ct. at 779.

Unlike the former Bankruptcy Act, the Bankruptcy Code automatically includes within the bankruptcy estate a debtor's interest in a leasehold. 11 U.S.C. § 541(a). Moreover, the Bankruptcy Code specifically provides that all costs or expenses which are necessary for the preservation of the estate are to be afforded priority as an administrative expense. 11 U.S.C. § 503(b)(1)(A). Given that the payment of the agreed upon rent is the essence of the lessee's right to enjoy exclusive possession of property under a leasehold, the ineluctable conclusion is that post-petition rents under a leasehold interest which has become property of the estate are expenses necessarily incurred by the estate to preserve that leasehold interest pending the trustee's decision to ultimately assume or reject the lease. Therefore, there is no need to look beyond the clear language of Section 541(a)(1) and Section 503(b)(1)(A) to reach the conclusion that I have. Put differently, Congress' silence concerning the past practice under the Bankruptcy Act of limiting administrative rent claims to reasonable rental value is irrelevant.[30]

**30.** The legislative history underlying the Bankruptcy Code itself is inconclusive as to whether Congress even gave any thought to the implications of including leasehold interests as property of the estate upon the theoretical underpinnings which supported the well established rule under the former Bankruptcy Act of limiting administrative rent claims to only fair rental value. At most, the House Judiciary Committee report indicates that Congress intended to continue whatever was the current practice concerning the allowance of administrative expenses.

> Though the general policy of the bankruptcy laws is equality of distribution among all creditors, current law makes certain exceptions based on a showing of special circumstance or special need ... There are five priority categories under the Bankruptcy Act. HR 8200 modifies these priorities without departing significantly from the policy pursued by the grant of priority in current law...
> As under current law, the first priority is for administrative expenses. Those who must wind up the affairs of a debtor's estate must be assured of payment, or else they will not participate in the liquidation or distribution of the estate. The major change from current law in this priority is the elimination of

fees for the Referee's Salary and Expense Fund.

House Report No. 95–595, 95th Cong., 1st Sess. at 186–87 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6147–48.

However, the legislative history supporting the 1984 and 1994 amendments to Section 365 indicates a Congressional hostility to the notion that lessors are to receive anything less than the agreed contract rate on account of a leasehold interest held by the bankruptcy estate pending its ultimate rejection. Granted, the limitation of the 1984 amendment to only non-residential leases of real property, 11 U.S.C. § 365(d)(3), and the limitation of the 1994 amendment to only commercial leases of personal property which are not rejected within 60 days of the petition, 11 U.S.C. § 365(d)(10), can be interpreted as implicit concessions by Congress that the lessor in all instances other than those covered by these two amendments is to receive only the fair rental value of the subject property until the lease is assumed or rejected. However, these amendments focus on the **payment** of post-petition rents as they come due, not on the **allowance** of the claim resulting from the estate's failure to make these payments. Indeed, both amendments make the point that the trustee is to pay rent at the contractual

Moreover, I am satisfied that my decision to allow administrative rent claims based upon the actual rental rate is consistent, as opposed to contrary, to what had been previously permitted under the former Bankruptcy Act. There is no question that the courts which were called upon to enforce the former Bankruptcy Act uniformly limited administrative rent claims to the reasonable rental value of the subject property. However, it is equally clear that those courts reached this conclusion based upon the premise that unexpired leases did not become property of the estate until the trustee decided to assume the lease. It followed from this premise that the estate could not be accountable for the actual rent owing on that lease until it was assumed. If the trustee ultimately rejected the lease, the aggrieved lessor had no recourse against the estate other than through an unjust enrichment claim based upon the reasonable rental value of the property. However, under the Bankruptcy Code, unexpired leases immediately become property of the estate and remain property of the estate until they are rejected. Therefore, the premise upon which those Bankruptcy Act courts relied has changed. It is fair to assume that these same courts would have reached exactly the opposite conclusion had they decided the issue based upon the new premise required by the Bankruptcy Code.

The two leading cases concerning the allowance of administrative expenses in the Sixth Circuit are *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106 (6th Cir.1987) and *United Trucking Service, Inc. v. Trailer Rental Company, Inc. (In re United Trucking Service, Inc.)*, 851 F.2d 159 (6th Cir.1988). In *White Motor*, Employee Transfer Corporation ("ETC"), held an executory contract with the debtor at the commencement of its Chapter 11 proceeding. The contract required ETC to provide relocation services for the debtor's employees. These relocation services included managing and maintaining homes purchased by ETC from debtor's relocated employees until ETC resold the homes to third parties. As of debtor's petition date, ETC owned 11 homes which had not yet been sold. ETC continued to manage these homes post-petition by making mortgage payments, by paying taxes and insurance premiums, and by generally maintaining the property. ETC filed an administrative claim for these post-petition expenditures.

The Sixth Circuit denied ETC's administrative claim, citing *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950 (1st Cir.1976) and *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir.1984).

The test for whether a claim qualifies as an administrative expense is set forth in *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976). In *Mammoth Mart* the court stated that a claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the proceeding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate. *Id.* at 954.

*In re White Motor Corp.*, 831 F.2d at 110.

It concluded that while the bankruptcy estate may have benefitted from the post-

rate as it comes due under the lease "notwithstanding Section 503(b)(1) of this title." While the reference to Section 503(b)(1) can be interpreted as affirming the pre-Code practice of allowing only post-petition rent at the reasonable rental value for the petition/rejection gap, it can just as easily be interpreted as recognition that all lessors under the

Bankruptcy Code (in contrast to the former Bankruptcy Act) are always entitled to an administrative claim for post-petition rent at the contract rate during the petition/rejection interval and that commercial landlords and equipment lessors are also entitled to demand immediate payment of the contract rate as provided by those amendments.

petition expenditures made by ETC, these expenditures could not be treated as administrative claims because they arose from commitments made by the debtor before the estate came into existence. *Id.*

At first blush, *White Motor* would suggest that a lessor is not entitled to any administrative rent claim for a rejected lease. The "transaction" upon which the administrative rent claim is based would always be the pre-petition lease agreement between the debtor and the lessor. *See also, In re Jartran, Inc.,* 732 F.2d at 586 (administrative claim for Yellow Page ads denied even though estate benefitted from ads because contract to place ads was reached pre-petition with the debtor). Given that the two-part test in *Mammoth Mart* is in the conjunctive, the question of whether the lessor should receive a reasonable rent based upon the estate's benefit from its post-petition possession of the subject property would be irrelevant. The lessor would simply not be entitled to an administrative rent claim. Its only recourse would be to compel rejection of the lease as quickly as possible so that it could regain possession and re-let the property.

However, while *White Motor* might suggest such a result, it does not ultimately support this result. The reason is twofold. First, the *Mammoth Mart* rule which *White Motor* adopted is based upon the former Bankruptcy Act, not the Bankruptcy Code. As already discussed, the estate did not immediately become a party to an executory contract or unexpired lease under the Bankruptcy Act; rather, the estate only became a party to the contract or lease (and, hence, liable under the contract or lease) when the trustee decided to ultimately assume it.

*Mammoth Mart* involved claims made by employees who had been discharged shortly after the case had been commenced. The debtor in *Mammoth Mart* had a pre-petition policy, apparently unwritten, which gave a discharged employee one week of pay for each year of service up to a maximum of four weeks of pay. This policy had not been assumed by the estate at the time the employees were discharged. Given these facts, it is not surprising that the *Mammoth Mart* court reached the conclusion that it did. The estate clearly was not a party to the pre-petition employment policies of the debtor because those policies remained outside of the estate so long as the trustee did not accept (*i.e.,* assume) them. Moreover, the former employees had no claim for unjust enrichment from the estate because their severance claims were not based upon post-petition services which they had rendered to the estate during the short period prior to their discharge but instead were based upon the four or more years of service they had rendered to the debtor pre-petition. The analysis is conceptually the same as that used in *United Cigar Stores* and *American Anthracite* with respect to administrative rent claims. Indeed, the court in *Mammoth Mart* cited *American Anthracite* as support for its conclusion. 536 F.2d at 954.

I submit that the court in *Mammoth Mart* would have approached the issue in an entirely different fashion if it had been confronted with an administrative rent claim brought under the Bankruptcy Code. As already discussed, I am satisfied that courts which had concluded that leases were entitled to administrative rent equal to only the reasonable rental value of the subject property based upon an unjust enrichment theory under the former Bankruptcy Act would conclude under the Bankruptcy Code that the administrative rent claim should be equal to the actual rent due because of the immediate inclusion of leasehold interests as property of the estate under Section 541(a)(1). There-

fore, for this reason alone it is inappropriate to rely upon *White Motor* as controlling law with respect to the calculation of administrative rent claims because of *White Motor's* own reliance upon *In re Mammoth Mart.*

The second distinguishing feature of *White Motor* is that it involved an executory contract, not an unexpired lease.[31] As the Sixth Circuit observed in *White Motor,* ETC was not induced by White Motor, as debtor-in-possession, to continue rendering services under the contract post-petition. *White Motor,* 831 F.2d at 111. Indeed, ETC had no obligation to continue rendering services absent White Motor's assumption of the contract pursuant to Section 365(b). Therefore, even though the bankruptcy estate had been a party to White Motor's pre-petition executory contract with ETC upon the commencement of White Motor's Chapter 11 proceeding, ETC had no right to rely upon the contract to support its claim for the post-petition services rendered. White Motor, as debtor-in-possession, had not requested those services to be rendered and ETC otherwise had no duty under the contract to perform those services.

However, unexpired leases are different from executory contracts in that a lessor's performance under a lease agreement is seldom executory at the inception of the bankruptcy proceeding. The bankruptcy estate is almost always in possession of the property subject to the debtor's leasehold interest when that interest becomes property of the estate at the outset of the proceeding. Therefore, it is meaningless to consider whether a lessor has been in-

duced post-petition by the trustee as debtor-in-possession to render services under the lease agreement. Absent the estate's rejection of the lease or modification of the automatic stay, a lessor has no choice but to continue allowing the estate to hold the leasehold interest under the terms of the lease agreement. However, the estate, as automatic successor-in-interest to the debtor's interest in the leasehold, likewise has no choice but to honor the debtor's commitments made under that same lease agreement, including payment of the agreed upon rent, if it desires to maintain the leasehold interest for the benefit of the estate. *See also, United Trucking Service,* 851 F.2d at 162.

The second Sixth Circuit case, United Trucking Service, did involve claims made against the estate on account of an unexpired lease. The debtor in *United Trucking Service* filed for Chapter 11 relief in 1983. At the time it filed, it was leasing 55 truck trailers from Great Dane Trailer, the predecessor-in-interest to Trailer Rental Company ("TRC"). Thereafter, TRC made several attempts to compel debtor to assume or reject the lease. Those efforts culminated in the lease being deemed rejected in May 1984 and the entry of an order directing the debtor to return all of the leased trailers to TRC.

The debtor returned 53 of the 55 trailers originally leased. The returned trailers were in various states of disrepair. The debtor reported that the two trailers which had not been returned had been stolen sometime pre-petition. TRC filed an administrative expense claim for repairs re-

---

**31.** There is some question as to whether there was even an executory contract involved in *White Motor.* ETC had issued its 60–day notice of intent to cancel its contract with debtor approximately 90–days before debtor filed its petition. The parties never reinstated this contract. Instead, they negotiated a new con-tract after the first lapsed. The second contract was ultimately signed by the parties post-petition. The debtor did not seek approval from the bankruptcy court to enter into this second agreement. 831 F.2d at 107–108.

lated to the 53 trailers returned and a second administrative expense claim for the loss associated with the two stolen trailers. The bankruptcy court allowed both claims and the district court affirmed.

The question which the Sixth Circuit faced in *United Trucking Service* was what amount, if any, should the lessor be allowed to recover from the estate as an administrative expense because of the debtor's continued use of the leased equipment in a manner which was inconsistent with the terms of the lease? Unfortunately, the court again reverted to law decided under the former Bankruptcy Act, and specifically *American Anthracite,* to answer the question posed.

*American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, SA,* 280 F.2d 119 (2d Cir.1960), we believe, articulated the appropriate rationale in a case of this kind:

> The right to priority in the event the trustee or debtor-in-possession receives benefits under the [executory] contract during the interval between the filing of the debtor's petition and the rejection of the contract "is an equitable right based upon the reasonable value" of the benefits conferred, rather than upon the contract price.
>
> . . .
>
> . . . [T]he purpose of according priority in these cases is fulfillment of the equitable principle of preventing unjust enrichment of the debtor's estate,

rather than the compensation of the creditor for the loss to him.

851 F.2d at 162.

Relying upon *American Anthracite,* the Sixth Circuit held that TRC's claim for the stolen trailer [32] was not an administrative expense because the parties had stipulated that the trailers had been stolen pre-petition and therefore no benefit had been conferred upon the estate. *Id.* at 163. The court also held that the bankruptcy court's limitation of the administrative claim for repairs to the reasonable value of the estimated repairs as opposed to the actual cost of repairs was appropriate but that further proceedings would be necessary to delineate between repairs which became necessary post-petition from those which were already needed when the debtor filed its petition. *Id.* at 164.

However, the result in *United Trucking Service* probably would have been the same had the Sixth Circuit had disregarded the case law decided under the former Bankruptcy Act and instead utilized the reasoning I have adopted in this opinion. The Sixth Circuit observed that the loss claim concerning the stolen trailers "must have arisen *pre-petition* because the estate never possessed or received any benefit from the two trailers" *Id.* at 163. Frankly, I do not understand this logic, for it suggests that any debt related to the debtor which arises post-petition and which does not confer a benefit upon the estate is a fortiori a pre-petition claim subject to discharge under, for example, Section 727(b).[33]

**32.** Although two trailers had been stolen, one was later found and returned to TRC in March 1985. *Id.* at 163.

**33.** The Sixth Circuit cited no provision of the Bankruptcy Code to support this conclusion and I am aware of none. Given that Congress was constrained to enact Section 502(g) in order to transform post-petition rejection claims into pre-petition claims, it is fair to assume that Congress would have enacted a similar provision applicable to all post-petition claims relating to the administration of the bankruptcy estate which did not confer a benefit upon the estate if that had been its intent.

However, within the observation that "the estate never possessed or received any benefit from the two trailers" is the seed for the reason why the loss claim should have been treated as a pre-petition claim: the debtor effectively stopped leasing these two trailers when they were stolen pre-petition. Originally, TRC had the contractual right under the lease agreement to receive regular rental payments on account of the two trailers for an agreed upon term with the return of these trailers at the conclusion of that term. However, the pre-petition theft of the two trailers placed debtor in breach of the lease agreement and consequently transformed TRC's rights with respect to these two trailers into a pre-petition damage claim consisting of the remaining rents owing for these two trailers and whatever residual value they might have had to TRC at the conclusion of the lease term.

Therefore, the Sixth Circuit denied TRC's administrative claim for the two stolen trailers simply because the claims arose pre-petition and therefore were subject to treatment as only unsecured, non-priority claims against the debtor. Indeed, the Sixth Circuit utilized this very same rationale in deciding whether to allow TRC's other administrative claim for damages related to the repair of the 53 trailers which debtor did return post-petition. The lower courts had determined as a matter of law that TRC's entire claim for repairs should be treated as an administrative expense. *Id.* at 163. The Sixth Circuit rejected this conclusion and directed the bankruptcy court to allocate the repair claim based upon whether the damage occurred pre– or post-petition.

The bankruptcy court should make findings as to what proportion of the damages occurred prior to filing due to normal wear and tear and aging of the equipment. **Only post-filing damages may be treated as an administrative expense after this allocation is made.** 851 F.2d at 162.[34]

I am also mindful of the Supreme Court's observations in *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), concerning collective bargaining agreements. The Court concluded that a collective bargaining agreement was not enforceable against the estate immediately upon the filing of debtor's bankruptcy petition and that it might never become enforceable. Whether it would become enforceable against the estate or not depended upon whether the collective bargaining agreement was ultimately assumed or rejected. *Bildisco,* 104 S.Ct. at 1198–99. Obviously, this conclusion conflicts with my own conclusion that, under the Bankruptcy Code, executory contracts and unexpired leases are enforceable against the estate upon the commencement of the bankruptcy proceeding and because the bankruptcy estate automatically succeeds to the rights and obligations of the debtor's executory contracts and expired leases by operation of Section 541(a)(1).

I would first note that the Supreme Court relied solely upon case law decided

---

**34.** The Sixth Circuit's affirmance of the bankruptcy court's decision limiting the post-petition repairs to a reasonable amount as opposed to the actual amount is not inconsistent with my analysis. The opinion in *United Trucking Service* itself does not indicate whether the debtor had in fact agreed to reimburse TRC for its actual repair costs. Assuming, then, that the agreement was silent on this point, it is likely that the bankruptcy court was not relying upon bankruptcy law to reduce TRC's administrative claim from that which had been contracted for to some reasonable amount, but instead was simply using rules of contract interpretation to add a term which the parties had omitted from their written agreement.

under the former Bankruptcy Act[35] and that it did not take into consideration the fact that the former Bankruptcy Act did not treat executory contracts and unexpired leases as property of the estate until they were actually assumed by the trustee.[36]

Second, *Bildisco* involved an executory contract, not an unexpired lease. Under general principles of contract law, the employees in *Bildisco* would have had no obligation to continue performing under the collective bargaining agreement post-petition because of the debtor's decision to file for bankruptcy. The debtor was most likely in breach of the agreement because of its filing and at best was in anticipatory breach of that agreement. If the employees chose to continue supplying post-petition employment services to the debtor without assumption of the collective bargaining agreement and notwithstanding the debtor's breach, then a valid case could be made that these services were incurred directly by the estate and "outside" of the terms of the contract. Therefore, while the contract might shed light on what was the reasonable value of the services rendered, it did not necessarily control.[37]

**35.** The Supreme Court did cite one case which was decided under the Bankruptcy Code, *In re Price Chopper Supermarkets, Inc.*, 19 B.R. 462 (Bankr.S.D.Cal.1982). However, *Price Chopper Supermarkets* itself relied upon Bankruptcy Act law to arrive at the conclusion that employees with collective bargaining agreements were entitled to only fair compensation during the post-petition interval before the agreement was ultimately rejected. *Id.* at 467.

**36.** The Supreme Court actually cited these cases as representing a rule whereby the trustee's rejection of an executory contract resulted in a "relation back" to the filing of the bankruptcy petition for purposes of further administration of the post-petition claim relating to the executory contract. However, as already discussed, the "relation back" concept utilized by the Bankruptcy Act courts cited in *Bildisco* was used in conjunction with the assumption of an executory contract, not its rejection. That is, the estate was not deemed to be liable under the executory contract or unexpired lease until the trustee elected to assume it. However, once the decision was made to assume and the court approved the assumption, all liability incurred under the executory contract or unexpired lease during the post-petition interval became a liability of the estate because the assumption "related back" to the date of the bankruptcy petition. *See, e.g., In re United Cigar Stores Co.*, 69 F.2d at 515. "Relation back" with respect to the concept of contract rejection became relevant only when the Bankruptcy Code broadened "property of the estate" to include executory contracts and unexpired leases, thereby making such contracts immediately enforceable against the estate. Relation back of the post-rejection claim for damages then became very important, as reflected by the adoption of Section 365(g)(1) and 502(g).

**37.** An analogous situation would be an executory contract for the supply of goods or services. If the purchaser under the contract filed for bankruptcy, the seller would have the right to cease providing the goods or services under that contract because of the debtor/purchaser's anticipatory breach. If the trustee (or debtor-in-possession) of the ensuing bankruptcy estate decided that it still needed the goods or services provided under the contract, the trustee could elect to purchase these goods or services from a new source and pay whatever price was reached with the new vendor. The trustee could also assume the executory contract with the existing vendor and then demand that it deliver the goods and services at the price provided in the original contract. However, the trustee would also have a third option, that being to defer assuming the contract for the time being and, in the interim, to do business with the existing vendor on an extra-contractual basis (*i.e.*, as if the vendor were a new source). If the vendor agreed to this third alternative, then the price under the original contract would control only if the trustee and the vendor agreed that that would be the price under the extra-contractual arrangement or if they had not agreed to any price and it was determined that the contract price was the reasonable price under the circumstances.

As already discussed, an executory contract like that addressed by the Supreme Court in *Bildisco* is fundamentally different from an unexpired lease. A lessor of property no longer has the option to withhold its performance under the lease agreement once possession of the subject property has been delivered. *Cf. United Trucking Service*, 851 F.2d at 162. Therefore, it is distinctly possible that the Court would have come to a different conclusion than it did in *Bildisco* had the contract in question been an unexpired lease instead of a collective bargaining agreement.

Finally, I cannot ignore the fact that the executory contract involved in *Bildisco* was a collective bargaining agreement. Although the Supreme Court clearly held that collective bargaining agreements fell within the definition of an executory contract for purposes of Section 365 and that they were to be treated no differently than other executory contracts, collective bargaining agreements are nonetheless different from other executory contracts. The social and political issues which have historically set labor and management at odds with each other prevent collective bargaining agreements from being analyzed strictly under ordinary contract principles. A bankruptcy court can no more ignore labor law when it is evaluating a collective bargaining agreement then can it ignore landlord-tenant law when it is evaluating an unexpired lease. If this point was not apparent at the time *Bildisco* was decided, it became apparent shortly thereafter when Congress amended the Bankruptcy Code in 1984 to treat collective bargaining agreements apart from other executory contracts in the context of a Chapter 11. 11 U.S.C. § 1113.

## C. *Application of the Law to the Immediate Case.*

 I must now apply the conclusions I have reached to the facts presented by RDK & Z and the Chapter 7 trustee. First, I conclude that RDK & Z has no claim against the estate under Section 365(d)(10) for rents which were to have been paid either by the debtor-in-possession in the Chapter 11 proceeding or by the Chapter 7 trustee in the ensuing Chapter 7 proceeding. Their respective failures to pay the rent required under the lease agreement with RDK & Z for the two tunnel washers afforded RDK & Z the right to seek relief from the automatic stay so that it might regain possession of the property which had previously been leased to Debtor. The debtor-in-possession's and Chapter 7 trustee's defaults under Section 365(d)(10) did not give RDK & Z a right independent of Section 503(b)(1)(A) to recover the unpaid rent from the bankruptcy estate.

 Second, I conclude that RDK & Z has a claim against the estate for the unpaid rents which accrued post-petition under the lease agreement until the lease was deemed rejected pursuant to Section 365(d)(1).[38] During this interval, the bankruptcy estate held the leasehold interest in the tunnel washers pursuant to Section 541(a)(1) and therefore the estate was obligated under the "neutral transfer" principle to pay the rent which had been agreed upon by RDK & Z and Debtor when that leasehold interest was created. While the estate's ultimate rejection of the lease with RDK & Z on December 31, 2000 resulted in any post-rejection claim for damages being treated as a pre-petition claim against the estate pursuant to 11 U.S.C. §§ 365(g)(1) and 502(g), the rejection had

---

**38.** *i.e.,* December 30, 2000, that being the 60th day after the case was converted to a

Chapter 7 proceeding.

no similar effect upon the claim for rents which had accrued from the petition date until the date of rejection. Of course, that claim was in part paid by Debtor while it operated in the Chapter 11 proceeding. The unpaid claim relates only to the time period during the Chapter 11 proceeding when either the Debtor paid only a portion of the monthly rent (*i.e.*, April–June, 2000) or Debtor did not operate (*i.e.*, July–October, 2000), and the time period during the Chapter 7 proceeding prior to the rejection of the lease by operation of law (November–December, 2000).[39]

Third, I conclude that RDK & Z's entire post-petition/pre-rejection claim against the estate is entitled to administrative priority under 11 U.S.C. § 503(b)(1)(A). When Debtor entered into its lease with RDK & Z for the tunnel washers, it acquired the right to possess and use these tunnel washers to the exclusion of RDK & Z for the term of that lease notwithstanding RDK & Z's ownership interest in the very same washers. This right became property of the estate when Debtor filed its bankruptcy petition. The "cost" of preserving this right was the continued payment of the rent which Debtor had agreed to pay RDK & Z for the leasehold interest created. The estate's obligation to pay the rent ceased only when the lease was deemed rejected on December 30, 2000.

Had this matter been outside the context of a bankruptcy proceeding, the Chapter 7 trustee might have been on a stronger footing to assert that the leasehold interest in the tunnel washers to which the bankruptcy estate had succeeded should be deemed abandoned when Debtor ceased operations in June of 2000. Both RDK & Z's and the building owner's separate interests in keeping these tunnel washers on site would explain why the tunnel washers were not recovered by RDK & Z notwithstanding the estate's professed intent to turnover the washers to RDK & Z when it ceased operations. However, under the Bankruptcy Code, expressing an intention to abandon a leasehold interest is not the same as actually abandoning that interest; abandonment can only be accomplished after notice and a hearing. 11 U.S.C. § 554(a). Neither Debtor as debtor-in-possession nor the Chapter 7 trustee ever sought to abandon the estate's leasehold interest in the tunnel washers. While either Debtor's or the Chapter 7 trustee's rejection of the lease under Section 365(a) would have accomplished the same result as an abandonment under Section 554(a),[40] that rejection did

---

**39.** RDK & Z might have been precluded from claiming all or a portion of the unpaid rents which accrued during this interval had there been an agreement between RDK & Z and either the Debtor or the Chapter 7 trustee to waive these rents or had there been a basis to estop RDK & Z from asserting this claim. However, the record is insufficient to support either of these bases for reducing RDK & Z's administrative claims.

**40.** Lease "rejection" under the Bankruptcy Code in fact incorporates two different Code concepts, that of "abandonment" under Section 554(a) and "rejection" under Section 365. A trustee who elects to reject a lease under Section 365(a) is in essence making two decisions: (i) that the leasehold interest

which became property of the estate at the outset of the bankruptcy should be abandoned because it is burdensome and of inconsequential value to the estate; and (ii) that the estate intends to treat any damage claim by the lessor for unpaid rents arising from her decision to reject as a pre-petition claim pursuant to Sections 365(g) and 502(g). Technically, the trustee should file separate applications to both abandon the leasehold interest under Section 544(a) and to reject the lease pursuant to Section 365(a) since rejection of a lease constitutes only a breach of the lease. 11 U.S.C. § 365(g). However, given that court approval is required for both an abandonment under Section 544(a) and a lease rejection under Section 365(a), the trustee's rejection of a lease under Section 365(a) upon

not take place until December 31, 2000, and then only by operation of law. *See* 11 U.S.C. §§ 348(a) and 365(d)(1).

■ Fourth, I conclude that whatever claim that RDK & Z has against the estate for any remaining rents owing under the lease subsequent to its rejection constitutes an unsecured non-priority claim against the estate entitled to distribution pursuant to Section 726(a)(2). 11 U.S.C. § 363(g)(1), 502(g). In other words, this post-petition claim for the remaining unpaid rents under the lease will be treated as if it was a pre-petition, unsecured non-priority claim.[41] Section 502(b)(6) would not apply in calculating this claim because the property in question is personal property and not real property.

Therefore, for the reasons stated above, I conclude that RDK & Z has an allowed administrative claim for unpaid rents and attendant late charges of $109,875. The claim is divided between a Chapter 7 administrative claim in the amount of $36,225, and a Chapter 11 administrative claim in the amount of $73,650.[42] 11 U.S.C. § 726(b).

■ RDK & Z has also requested that the Chapter 7 trustee pay its administrative claims immediately. I am denying this request. RDK & Z has no greater right to payment of its administrative claim than any other administrative claimant of the estate. The Chapter 7 trustee's duty under Section 704 is to liquidate the property of the estate and to distribute the proceeds therefrom in the manner prescribed by Section 726. In addition, the Chapter 7 trustee is to distribute proceeds pro rata among Chapter 7 administrative claimants or among Chapter 11 administrative claimants if the amount to be distributed to either of these classes of claimants will be less than 100%. 11 U.S.C. § 726(b).

Based upon the record before me, it appears that the liquidation proceeds to be distributed by the Chapter 7 trustee may be insufficient to pay even the Chapter 7

court approval incorporates within it the corresponding abandonment of a leasehold interest permitted by Section 544.

Rejection of an unexpired lease by operation of law pursuant to Section 365(d) does not materially alter the outcome. A Section 365(d) rejection of a lease is not sufficient to also constitute an abandonment of the leasehold interest because there has not been any notice or opportunity to be heard as required by Section 554(a). However, the rejection of the lease does constitute a breach and that breach not only dictates the treatment of the lessor's post-rejection claim pursuant to Sections 365(g) and 502(g) but also would constitute cause under Section 362(d)(1) for the lessor to seek relief from the stay in order to evict the trustee from the subject property. Therefore, the practical difference between a voluntary rejection by the trustee under Section 365(a) and a rejection by operation of law under Section 365(d) is the speed within which the lessor may act to recover possession of the subject property. If the rejection is voluntary, then the leasehold interest is also deemed abandoned and the lessor need not concern itself about violations of the automatic stay in regaining possession of the subject property, at least as far as the estate is concerned. On the other hand, if rejection of the lease is by operation of law, the leasehold interest would continue to be property of the estate and therefore the lessor would have to vacate the automatic stay before it could proceed to recover possession of the leased property.

41. Although clearly not the case in this instance, had the estate continued to use the tunnel washers after the underlying leasehold interest had been rejected/abandoned, RDK & Z would have had an administrative claim for the reasonable rental value of the equipment which would have reduced the amount of the rejection claim under the principles of mitigation.

42. The Chapter 11 administrative claim includes $70,200 as unpaid rent and $3,425 as late fees. *See* p. 872, n. 3, *supra*.

administrative claimants in full. Therefore, it would be inappropriate to order the Chapter 7 trustee to pay either RDK & Z's Chapter 7 or Chapter 11 administrative claim at this point. The Chapter 7 trustee will be left the discretion to administer RDK & Z's administrative claim along with the balance of the administrative claims against the estate subject to the distribution provisions of Section 726 and his general duties under Section 704.

A separate order will be entered which is consistent with this opinion.